IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON
TRANSCRIPT OF PROCEEDINGS

----------------------------------------

IN RE:  C.R. BARD, INC., PELVIC REPAIR        MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION          2:10-MD-2187

----------------------------------------

IN RE:  AMERICAN MEDICAL SYSTEMS, INC.,       MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                 2:12-MD-2325
LIABILITY LITIGATION

----------------------------------------

IN RE:  BOSTON SCIENTIFIC CORPORATION         MDL NO.
PELVIC REPAIR SYSTEM PRODUCTS                 2:12-MD-2326
LIABILITY LITIGATION

----------------------------------------

IN RE:  ETHICON INC., PELVIC REPAIR           MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION          2:12-MD-2327

----------------------------------------

IN RE:  COLOPLAST CORP. PELVIC SUPPORT        MDL NO.
SYSTEMS PRODUCTS LIABILITY LITIGATION         2:12-MD-2387

----------------------------------------

IN RE:  COOK MEDICAL, INC., PELVIC REPAIR     MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION          2:13-MD-2440

----------------------------------------

STATUS CONFERENCE
September 19, 2013

BEFORE THE HONORABLE **JOSEPH R. GOODWIN**, District Judge
AND
THE HONORABLE **CHERYL A. EIFERT**, Magistrate Judge

**APPEARANCES**

**For the Plaintiffs:**


**MR. HENRY G. GARRARD, III**
Blasingame, Burch, Garrard, Ashley, P.C.
P.O. Box 832
Athens, GA  30603


**MR. CLAYTON A. CLARK**
Clark, Love & Hutson
440 Louisiana, Suite 1600
Houston, TX  77002


**MR. FRED THOMPSON, III**
Motley Rice, LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464


**MR. BRYAN F. AYLSTOCK**
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL  32502


**MS. RENEE BAGGETT**
Aylstock, Witkin, Kreis & Overholtz
Suite 200, 17 East Main Street
Pensacola, FL  32502


**MR. THOMAS P. CARTMELL**
Wagstaff & Cartmell, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO  64112


**MS. FIDELMA FITZPATRICK**
Motley Rice, LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464

**APPEARANCES**

**(Continued)**

**MS. AMY ESKIN**
Levin Simes, LLP
353 Sacramento Street
San Francisco, CA  94112


**MR. DEREK H. POTTS**
The Potts Law Firm, LLP
908 Broadway, 3rd Floor
Kansas City, MO  64105


**MR. ROBERT SALIM**
Law Offices of Robert L. Salim
1901 Texas Street
Natchitoches, LA  71457


**MR. RILEY BURNETT**
Law Offices of Riley L. Burnett, Jr.
Suite 1600
440 Louisiana
Houston, TX  77002


**MR. A. TIMOTHY JONES**
Hawkins, Parnell, Thackston & Young
109 Capitol Street
Suite 1000
Charleston, WV  25301-2609


**MR. CARL N. FRANKOVITCH**
Frankovitch, Anetakis, Colantonio & Simon
337 Penco Road
Weirton, WV  26062

```
 1                          APPEARANCES

 2                          (Continued)

 3

 4   MR. HARRY F. BELL, JR.
     The Bell Law Firm, PLLC
 5   P.O. Box 1723
     Charleston, WV  25326-1723
 6

 7   MR. PAUL FARRELL, JR.
     Greene, Ketchum, Bailey, Walker, Farrell & Tweel
 8   P.O. Box 2389
     Huntington, WV  25724-2389
 9

10   MS. AIMEE H. WAGSTAFF
     Andrus, Hood & Wagstaff, PC
11   1999 Broadway, Suite 4150
     Denver, CO  80202
12

13   MR. BENJAMIN H. ANDERSON
     Anderson Law Offices
14   1360 W 9th Street
     Suite 215
15   Cleveland, OH  44113

16

17   MR. MARTIN D. CRUMP
     Davis & Crump
18   1712 Fifteenth Street
     Suite 300
19   Gulfport, MS  39501

20

21   FOR THE DEFENDANTS:

22

23   MS. BARBARA R. BINIS
     Reed Smith, LLP
24   2500 One Liberty Place
     1650 Market Street
25   Philadelphia, PA  19103
```

**APPEARANCES**

**(Continued)**

**MS. LORI G. COHEN**
Greenberg Traurig
Suite 2500
Terminus 200
3333 Piedmont Road
Atlanta, GA   30327


**MS. CHRISTY D. JONES**
Butler Snow
P.O. Box 6010
Ridgeland, MS   39158


**MS. DONNA JACOBS**
Butler Snow
P.O. Box 6010
Ridgeland, MS   39158


**MR. STEPHEN J. MCCONNELL**
Reed Smith, LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA   90071


**MR. RICHARD B. NORTH, JR.**
Nelson, Mullins, Riley & Scarborough, LLP
201 17th Street, NW Suite 1700
Atlanta, GA   30363


**MR. CLIFF MERRELL**
Greenberg Traurig, LLP
3333 Piedmont Road, N.E.
Suite 2500
Atlanta, GA   30305

**APPEARANCES**

**(Continued)**

**MS. DEBORAH A. MOELLER**
Shook, Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, MO  64108

**MR. JON STRONGMAN**
Shook, Hardy & Bacon, LLP
2555 Grand Boulevard
Kansas City, MO  64108

**MR. DOUGLAS B. KING**
Wooden & McLaughlin
211 North Pennsylvania Street
One Indiana Square
Suite 1800
Indianapolis, IN  46204-4208

**MS. MELISSA FOSTER BIRD**
Nelson, Mullins, Riley & Scarborough
P.O. Box 1856
Huntington, WV  25719-1856

**MS. LANA K. VARNEY**
Fulbright & Jaworski, LLP
98 San Jacinto Boulevard
Suite 1100
Austin, TX  78701-4255

**MR. DAVID B. THOMAS**
Guthrie & Thomas, PLLC
500 Lee Street, East
Suite 800, P.O. Box 3394
Charleston, WV  25333-3394

1                           **APPEARANCES**

2                          **(Continued)**

3

4    **MR. RONN B. KREPS**
     Fulbright & Jaworski, LLP
5    2100 IDS Center
     80 South Eighth Street
6    Minneapolis, MN  55402-2112

7

8    **MR. MATTHEW P. MORIARTY**
     Tucker Ellis, LLP
9    925 Euclid Avenue, Suite 1150
     Cleveland, OH  44115
10

11   **MR. ROBERT T. ADAMS**
     Shook, Hardy & Bacon
12   2555 Grand Boulevard
     Kansas City, MO  64108-2613
13

14

15

16

17

18

19

20   Court Reporter:            Lisa A. Cook, RPR-RMR-CRR-FCRR
                                (304)347-3198
21                              lisa_cook@wvsd.uscourts.gov

22

23   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
24

25

```
 1                    P R O C E E D I N G S

 2          DISTRICT JUDGE GOODWIN:  Good morning.

 3      I see that I have helped out the Embassy Suites and the

 4  Marriott Hotel.  It's nice to see everybody.

 5      The following attorneys are excused from today's

 6  conference.  Before I mention their names, let me say I'm

 7  noticing a trend of more excuses being asked for.  And I

 8  would ask all counsel to go back and re-read the pre-trial

 9  order dealing with service on the, in the various offices,

10  the MDLs.

11      Dustin Rawlin, Mike Farrell, Mike Bonasso and Elizabeth

12  Taylor, Mark Mueller.

13      If you're not on this list and are absent today, you've

14  not been excused.

15      The agenda has the potential to be lengthy.  I'll ask

16  for your assistance in keeping it as brief as we can while

17  addressing the issues in as much depth as is required.

18      The first item on the agenda is titled "Tolling

19  Issues/Timing and Volume of Filing Complaints."

20      Let me just say generally that I'm agreeable to a

21  reasonable extension of the January 15th deadline contained

22  in the amended order regarding delayed filing, but I'd like

23  to hear from you.

24      Who will address this?

25          MR. GARRARD:  Your Honor, --
```

1          DISTRICT JUDGE GOODWIN:  Mr. Garrard.

2          MR. GARRARD:  -- on the plaintiffs' side, it is

3     clear that many law firms have more cases that need to be

4     filed than can be accommodated by the 10 per week per

5     plaintiff's firm.

6        We would simply request that there be a 60-day

7     extension at this point for filings.  Alternatively, we

8     could seek leave to file more cases, but I understand that

9     that may become quite burdensome -- more cases per week.

10    That might become burdensome on the Clerk's Office.

11       So, in discussions, our request is that the Court at

12    this point grant us 60 additional days, and that we then be

13    obliged to report back to the Court probably in 60 days and

14    see where we are.

15          DISTRICT JUDGE GOODWIN:  Let me hear from the

16    defendants as these matters are by their grace and good,

17    good nature.

18          MS. JONES:  Your Honor, if I might, Christy Jones

19    for Ethicon.

20          DISTRICT JUDGE GOODWIN:  Yes, ma'am.

21          MS. JONES:  I, I understand the demands that are

22    placed on the Court and staff.  Frankly, I think there are

23    some problems that have been made for the defendants that

24    were unforeseen by this including, as Your Honor is well

25    aware, the fact that we now have thousands of these cases

1    that have been served but not filed.

2        We're not sure whether they're going to be filed.  And

3    we have very little information about those cases which

4    presents additional problems when Your Honor is interested

5    in moving along on some other timetables.

6        So, what I would say first is to the extent that the

7    Court deems it necessary, and obviously that's the Court's

8    prerogative, but, but, secondly, one issue that has come

9    up -- and I apologize to the Court, I didn't realize until

10   this morning -- is that when cases are filed, we are not

11   being served or advised of the filing.

12       And because of that, we've then been required to go

13   back to the, to the Clerk's Office and obtain at our cost a

14   copy of the filed docket.

15       So, whatever the Court does, I would ask that, that

16   when the plaintiffs file, actually file the complaint, that

17   they serve us with a copy of the filed complaint so that

18   we're not incurring the additional cost of having to go to

19   the Clerk's Office and reimburse the clerk for getting that.

20            DISTRICT JUDGE GOODWIN:  I need help because I

21   have to admit that I don't quite understand the process as

22   it exists.  I thought of things as sort of served, or filed

23   but not served or served or vice versa.  I don't, I don't

24   remember what was in the contemplation of the parties.  I

25   know Kate does, but --

1      Who, who can help me out here?

2      Here's -- Mr. Garrard, one of my problems with like a

3  60-day extension is I don't, I don't think if I said six

4  months that I wouldn't get to the end of the six months and

5  not have a problem.  So, I need some reasonable amount of

6  time and some mechanism.  And I know the clerk is still

7  going to get slammed.

8           MR. GARRARD:  Well, the practical problem is that

9  we're trying to accommodate what is necessary from the

10  Clerk's Office.  At the same time, there are a large number

11  of cases to be filed.  And practically they cannot get filed

12  at 10 per week per plaintiff's firm by January 15th.

13           DISTRICT JUDGE GOODWIN:  Well, it sounds to me

14  like we're going to need to increase the number of filings

15  per week.

16           MR. GARRARD:  I think, Your Honor, that would be

17  helpful.  I also believe that in deference to the Clerk's

18  Office, some extension of time would be necessary.

19      In terms of Ms. Jones's concern about not being

20  notified of the filing, I'm getting all sorts of letters

21  from firms informing me that they have filed cases.

22      Frankly, I hadn't looked at those letters close enough

23  to know if Christy's been notified of that or not.  But I

24  don't see a problem.  If the need is that they receive a

25  copy of the complaint, fine.  I don't see any problem with

```
 1   that.

 2            MS. JONES:  I, I think that that's what we need,

 3   Your Honor, is that some -- we're sometimes getting a letter

 4   saying it's been filed, but we don't actually have a filed

 5   copy of the complaint which is what we need.  So, we just

 6   need counsel to serve us with a filed copy when it is

 7   actually filed.

 8            DISTRICT JUDGE GOODWIN:  Do they know who to send

 9   it to?

10            MR. GARRARD:  Yeah.

11            DISTRICT JUDGE GOODWIN:  Would they know who to

12   send it to?

13            MR. GARRARD:  Yes, sir, they do.

14            DISTRICT JUDGE GOODWIN:  All right.  Let's have

15   them do that then.

16            MR. GARRARD:  And maybe Ms. Jones and I could just

17   work together to create something that could be submitted to

18   the Court as an amendment.  And if we continue --

19            DISTRICT JUDGE GOODWIN:  I'm very agreeable to the

20   working together solution.

21            MR. GARRARD:  We continue the tolling while this

22   goes on, but we'll try to get it done.

23            DISTRICT JUDGE GOODWIN:  And I think you are going

24   to have to increase the number of cases filed if there are,

25   if there is this large volume out there.  But I think 60
```

1    days is too long.  I'm perfectly willing to consider a

2    30-day extension, but 60 days is too long.

3              MR. GARRARD:  So long as the Court will let us

4    come back to you.  Not wanting the Court to be misled, at 10

5    per week, 30 days won't do it either.  So, whatever we can

6    do, the Clerk's Office to increase it, we would like to do

7    that.

8              DISTRICT JUDGE GOODWIN:  Well, I think, I think

9    you're going to just take the 30 days as a given, as an

10   outside limit, and then tell me how many per day we have to

11   do in your best judgment to get there.

12             MR. GARRARD:  May, may we work with Ms. Fife in

13   terms of what, --

14             DISTRICT JUDGE GOODWIN:  Yes.

15             MR. GARRARD:  -- what the Clerk's Office can

16   accommodate, Your Honor?

17             DISTRICT JUDGE GOODWIN:  Right.  And they may get

18   behind.  But if they do -- no Clerk's Office in the country

19   has as many filings.  We are using personnel from other

20   Clerk's Offices to help us.  We have a Clerk of Court that

21   is very good and very careful.  And you can tell that from

22   the quality of the entries that you're seeing later.  You

23   don't want to compromise the quality of the entries.  But we

24   may experience some delay if we get these large numbers.

25   But that just may be something we can't help.

 1          MR. GARRARD:  Well, we'll get with Ms. Jones and

 2    with Kate and try to get it worked out, Your Honor.

 3          DISTRICT JUDGE GOODWIN:  All right.

 4       Anything else on that?

 5          MR. GARRARD:  No, sir.

 6          DISTRICT JUDGE GOODWIN:  The next item on the

 7    agenda is the general status of the bellwether process.  I

 8    could go on about that for a while, but who, who will

 9    address that?

10          MR. GARRARD:  Your Honor, I put that on there

11    having had the experience and pleasure of being before Your

12    Honor for quite some time this summer because I thought that

13    there would be a large assemblage here, and that perhaps

14    just a sort of update on where we are would be appropriate.

15       From our standpoint, we have more Bard cases scheduled.

16    Your Honor is aware of the issue in regard to the *Rizzo*

17    case.  And I think perhaps we know where that's going.  And

18    we have the *Jones* case set for trial, I believe, November

19    the 12th.  I know that the AMS cases have been moved.  I'm

20    not sure of the date that they will be reset.  And there are

21    Johnson & Johnson, Ethicon cases set, I believe, in January.

22       And there's just some element of movement in terms of

23    the schedule and where they are.  And we just felt that

24    perhaps there's some discussion Your Honor might want to

25    have in relation to that as well.

1          DISTRICT JUDGE GOODWIN:  Well, I think it's fair

2    to say that as of today, I'm not as big a fan of bellwether

3    cases as Judge Fallon is.  On the other hand, I haven't

4    determined any alternative solution at this time.

5          And my proposal is -- and I think Kate suggested I

6    might come up with a better word but it's the only word I

7    know.  I'm going to keep the bulldozer moving, and we will

8    continue to try bellwether cases.

9          There will be some adjustments in trial dates because,

10   frankly, I've had very good lawyers involved who have done a

11   good job of getting their cases ready on very ambitious

12   schedules.  And we're going to stay busy.  I've actually had

13   a couple weeks off.  It's been kind of nice.

14         But we're going, we're going to go forward with the

15   bellwether process.  You should have a pretty good idea from

16   Kate in the near future of where, for example, Ethicon and

17   AMS are on the dates.

18         We've had conversations with counsel for plaintiffs and

19   defendants in those cases about differences in trial dates.

20   We have some docket control orders that are still to be

21   submitted.  But it's, it's, it's taking shape.  And I think

22   it's fair to say that within the next few days, you'll know

23   exactly what the schedule looks like, or we'll try to do

24   that.

25         Anybody want to talk about that any more?

 1          MS. COHEN:  Judge, I might just add --

 2          DISTRICT JUDGE GOODWIN:  Yes, ma'am.

 3          MS. COHEN:  Good morning, Your Honor.  It's a

 4  pleasure to see you again.

 5          DISTRICT JUDGE GOODWIN:  It's good to see you.

 6          MS. COHEN:  And just to --

 7          DISTRICT JUDGE GOODWIN:  Are you still living at

 8  the Embassy Suites?

 9          MS. COHEN:  You know what.  I actually got back

10  last night and there was such a warm greeting there, I felt

11  like I was coming home.  My same room was saved for me, so

12  it was a pleasure.

13      But, you know, just to respond to what Mr. Garrard

14  said, as I think we all saw this morning, the third

15  bellwether in the Bard litigation, plaintiffs moved to

16  dismiss it with prejudice this morning.  And, so, to the

17  extent necessary, we'll respond to that as needed.

18      And then beyond that, we do have the *Jones* trial coming

19  up in November.  We do think -- we agree with Your Honor.

20  And I re-read Judge Fallon's *Law Review* article last night,

21  in fact, on bellwethers from 2008.

22          DISTRICT JUDGE GOODWIN:  I did too.

23          MS. COHEN:  Yeah.  And, I mean, I think his points

24  are well-taken that it is a process that can work, and we

25  are still --

```
 1              DISTRICT JUDGE GOODWIN:  He tried about 10 cases,

 2    as I recall, in the Vioxx -- maybe I'm overestimating it.

 3         Does anybody remember?  I think was about 10.

 4              MS. COHEN:  I think it was about 10.  That's the

 5    number I have in mind, Your Honor.

 6              DISTRICT JUDGE GOODWIN:  And my default position

 7    as a trial judge is to try cases.  I am not so sure that I

 8    wouldn't be better off just reaching in a paper bag and

 9    pulling out a case number than I would with the process

10    we've used so far.  And I don't mean that as disrespectfully

11    as it sounds.  But it does reflect my disappointment in the

12    cases that I've got currently on the trial calendar.

13         But we'll -- we're going to keep doing that.  I have

14    other things that, some of which you're going to address

15    today on either side like consolidation that I'm

16    considering.

17         I know that all of you are considering ideas for

18    settlement protocols to the extent that there's any

19    possibility of that.  I said without joking that I don't

20    have 30,000 minutes left in my life without thinking that I

21    can deal with in any individual way 30,000 cases, nor can

22    the federal judiciary as a whole try 30,000 additional

23    cases.  We can't, can't.  So, we have to find another way.

24         But, as I said and got a laugh yesterday, and I hope I

25    will today, I can make your lives so miserable that it will
```

```
 1   otherwise be resolvable.  And I didn't mean that -- I didn't

 2   mean -- I didn't mean to be mean.  I just meant there are

 3   mechanisms and ideas and things that I can do that will move

 4   things along, and I intend to see that.

 5       I don't plan for any pause while we contemplate our

 6   navels.  We're going to keep moving forward.  We're not

 7   going to gaze into crystal balls and think of where we're,

 8   where we're going to be.  On the other hand, I'm not going

 9   to just waste your time or my time.

10       Let's get to that consolidation item on the agenda.

11   I've asked for the parties' submissions.  I have barely read

12   half of the plaintiffs' response this morning.  I didn't

13   read it all.

14       So, I'll let the plaintiffs go first.

15            MR. GARRARD:  Your Honor, we have -- may I just

16   stand right here?

17            DISTRICT JUDGE GOODWIN:  You may.

18            MR. GARRARD:  We have decided that I will make the

19   presentation in regard to consolidation, and that after the

20   defendants present whatever they present that Mr. Clark will

21   make a rebuttal presentation.  And if he screws it up, I'll

22   perhaps say something else.

23       But where --

24            DISTRICT JUDGE GOODWIN:  He's smiling.

25            MR. GARRARD:  He did.  It may be the only remedy I
```

```
 1    get of the day, Your Honor.

 2         Where we need to start, from our perspective, is two

 3    places, or maybe three.

 4         One is we fully agree with Your Honor that bellwethers

 5    need to continue at the greatest pace possible.

 6         Secondly, we need to talk about the human element which

 7    I think is lost in where we are.

 8         And, thirdly, we will talk to the Court about what we

 9    have proposed as a consolidation plan.  I must say I'm

10    disappointed that Your Honor did not read with great vigor

11    our presentation.  But --

12              DISTRICT JUDGE GOODWIN:  I was late to work.

13              MR. GARRARD:  You should have been with me last

14    night as I was getting e-mails, Your Honor, from people

15    telling me what to do at 11:30 and 12:00 at night.

16         But I want to talk first about the human element.  And

17    it's very real.  And I'll tell you how real it is.  After we

18    tried the Cisson case and we got the verdict, and as one

19    would expect, citizens in various places and clients in

20    various places heard about it and they wanted to know about

21    it.

22         And last week we had a meeting with people from my

23    firm -- I was not here, but the senior members of my firm

24    were here, Mr. Farrell was here -- with individuals that we

25    represent from West Virginia.  And we had about 50 people
```

1   there.

2       And one of my paralegals who has worked on this since

3   the very beginning came in and she sat down in my office and

4   she started crying.  And she said, "Henry, you've got to do

5   something.  Our clients feel as if we have abandoned them,

6   and they want to know when do they ever get to say their

7   piece."

8       And to give you a couple of examples, we have a lady --

9   and I won't use names because I don't think it's appropriate

10  to do that in here at this point.  We have a lady who's a

11  West Virginian who is from Huntington.  She had surgery

12  using one of the defendant's products.

13      She wound up going to Christ Hospital in Cincinnati

14  where there's a Dr. Mickey Karram, and he did three

15  surgeries on her.  And she wound up with what's called a

16  neovagina.

17      And for Your Honor's benefit, a neovagina means that

18  her vaginal canal had been destroyed, and destroyed to the

19  point that it was no longer essentially there.  And this

20  doctor took tissue from this lady and he created this thing

21  they call a neovagina.  They use colon tissue.  And it

22  didn't work.  And she got this work done at Christ Hospital

23  as a charity patient.

24      We have call after call -- and I'm sure my office is no

25  different than others.  We have call after call from clients

1    that say, "I have no insurance and I have no money, and I've

2    been told I need surgery," or, "I'm in a certain

3    circumstance.  What do I do?"

4        And I have a lady in my office who is dedicated to

5    calling hospitals and saying, "Do you have a charity

6    program?  Will you consider this?"

7        I'm, I'm pleased to say that in Cincinnati, Christ

8    Hospital does.  I'm pleased to say that the Cleveland Clinic

9    in Cleveland does.

10       Well, this particular lady, after she had the neovagina

11   created and then mesh eroded into it, it destroyed it.  She

12   was then sent to Cleveland to -- not, not Cleveland -- to

13   the Mayo Clinic to a high-level specialist who then said,

14   "I'm going to try something on you but, ma'am, you need to

15   understand it's experimental and I don't know if it will

16   work or not."

17       And she went to him.  But she had to borrow money --

18   and they also did it on a charity basis.  She had to borrow

19   money in order to get there.

20       And she sits in this meeting and she says to my people,

21   "What's going to happen to me and when do I get it

22   addressed?"

23       And out of that meeting, there was also one lady who

24   was not there.  And we found out why she was not there.  She

25   was in a hospital in Huntington.  And we had also gotten

1   charity care for her.

2      And she had that week been transported by ambulance to

3   the Cleveland Clinic.  They had examined her.  The mesh had

4   done things to her internally to the extent that she could

5   not move her bowels.  She had had no solid food for two

6   weeks.  She was on a feeding tube.  And I, frankly, don't

7   quite understand how that gets removed as waste material.

8      But she had been transported by ambulance to the

9   hospital there.  They looked at her.  They examined her.

10  And then they sent her back to Huntington to have more tests

11  done.  When she got back to Huntington, Huntington said, "We

12  can't do those tests."

13     So, she's then transported back to the other hospital

14  to see what they can do and whether they can do surgery on

15  her.  But she's also destitute.

16     Yesterday I got an e-mail -- and Your Honor has heard

17  me make these vignettes before, but they're true.  I got an

18  e-mail from a lady who literally used four-letter words with

19  me, telling me what a poor lawyer I am because I'm not

20  moving her case.

21     And one of the points that I, I feel obligated to make

22  on behalf of my clients, and I think this fits everybody's

23  clients, is that many of these people have real injury.  And

24  a horrible number of them -- and I don't know how this fits

25  with ObamaCare because I, frankly, don't even understand it.

1    I don't know how it fits with where we are as a society.

2        But many of these people do not have health insurance

3    and they have no money and they have no job.  And while I

4    know that arguments can be made that there are cases that

5    shouldn't be filed, I'm not debating that.  But there are

6    many, many cases that are filed that are very real and women

7    from this state and others are very hurt.  And they don't

8    have the resources to get the care that they need.

9        I could go into story after story, but I would probably

10   lose the Court's attention if I did that.  But I wanted to

11   start our --

12           DISTRICT JUDGE GOODWIN:  You have used up a lot of

13   your 10 minutes.

14           MR. GARRARD:  I didn't know I had just 10 minutes,

15   Your Honor.

16       I wanted that to be something that is real in relation

17   to this.

18       In terms of consolidation, one of the reasons that we

19   believe consolidation is very important is because it can

20   satisfy a couple things.

21       On the one hand, the defendants say, "We need lots of

22   trials to decide what we're going to do."  I'm not sure that

23   they really do, but let's assume that they do.

24       I've heard that one defendant says, "I need to try 30

25   cases before I'm going to do anything."  So, we say, "Okay,

1   if that's the case, let's consolidate some cases."  And if

2   this Court were inclined to consolidate 15 cases at a time

3   as to that defendant, then in two consolidated trials we

4   could satisfy that need for 30 cases.

5        I'm not going to argue to the Court the Rule 42

6   provisions.  This Court knows those provisions quite well.

7   The law is quite clear that Your Honor can consolidate cases

8   if you are so inclined.  It's been done before.

9        Interestingly, Mr. Rice is back here from the Motley

10  Rice firm.  He and I tried a case called *Cimino*.  And Joe

11  probably remembers how many years ago it is.  I try to

12  forget how many years ago it was.  He was on the plaintiffs'

13  side and I was on the defendant's side.

14       I begged.  I pleaded.  I filed motions, et cetera,

15  saying, "You can't do this."  Well, the Court did do that,

16  and the Fifth Circuit upheld the consolidation portions of

17  it.  Some extrapolation portions that the Judge attempted to

18  do, the Fifth Circuit said, "You can't do that."  But in

19  terms of the consolidation, the Court upheld that.

20       And, and the point I wanted to make is while I didn't

21  want that at the time, my client didn't want it at the time,

22  it actually worked.  And how do I know it worked?  There

23  were 10 class -- it was a combined class in consolidation.

24  There were 10 exemplars.  I actually won one of the

25  exemplars.

1    And, so, my point in that is that within that

2    consolidation, I have to say it worked because they were not

3    all plaintiffs' verdicts.  There was a defense verdict.

4    I have tried other consolidated cases, as have other

5    people in this courtroom.  And Your Honor is aware of all

6    that.  So, it, it can be done.  When you do the Rule 42

7    analysis, these cases beg for consolidation.  It is not

8    overwhelming to a jury.

9    What we have proposed to Your Honor is this:  That Your

10   Honor tell us the number.  And we have proposed that Your

11   Honor start with West Virginians who have filed cases in

12   this court.  I don't think anybody could dispute that you

13   have the power to do as you want to in regard to those cases

14   from a consolidation standpoint, and that we start at that

15   point.

16   If you take Bard, for example, our proposal is that

17   there are Avaulta cases, the Avaulta Biosynthetic, the

18   Avaulta Plus, and the Avaulta Solo which you heard a lot

19   about a couple weeks ago.  Those cases from a corporate

20   discovery standpoint are such that we could try

21   consolidations now.

22   We are asking the Court -- and I'm not just focusing in

23   on Bard as I'm sometimes accused of doing.  I'm using that

24   simply as an example.

25   We propose that Your Honor tell us how many cases you

1   would like to have consolidated.  In the proposal that we

2   made, we said you let us select three quarters of them and

3   put it there and put the burden upon us to select cases that

4   meet homogeneity, that have the same state's law, and that

5   the defendants select 25 percent of the cases.

6        Why do we do it that way?  One of the reasons that we

7   suggest that is that we then avoid the back and forth

8   debate, fight, whatever, as to:  Is this an appropriate

9   case?  Is that an appropriate case?

10       You put the burden upon us to come to you with cases

11  that are appropriate and would pass muster under Courts of

12  Appeals or whatever examination that we submitted to you.

13       You tell us how many and you tell us when.  And we have

14  the burden then to bring to you either as three quarters/one

15  quarter, or you can put the burden upon us and say,

16  "Plaintiffs, you come to me with cases that will fit in

17  terms of homogeneity, in terms of state law, and let's go."

18       We can start with West Virginia.  That's the nidus of

19  this litigation right now.  We suggest to the Court that we

20  have a consolidation as relates to that.  We suggest to the

21  Court that we can do more than one consolidation at a time,

22  and we can do bellwethers.

23       The Court, I believe, has the authority to utilize the

24  Huntington division if you wanted to, and that you could

25  give the Bard cases, for example, to the Huntington division

1   and say, "I would like you to try these cases," or however

2   Your Honor was inclined to do that.

3        We recognize that one of the problems that exists is

4   you only have so many hours in a day that you can try cases.

5   And, so, we are suggesting that we reach out and we utilize,

6   for example, the Huntington division.

7        At the same time, if Your Honor were inclined to do

8   that, we would suggest that there be a consolidation set up

9   of Ethicon cases.  We think that the Prolift case has been

10  tried in New Jersey and that it is prepared to an extent it

11  could be tried.  Your Honor already has a TVT case

12  scheduled, or cases scheduled, I think, in January.  Let

13  them go forward.  But, at the same time, let's set up a

14  consolidation.

15       The same thing would be true in regard to AMS.  There

16  are AMS TVT cases set for trial currently in December, but I

17  understand they're going to move.

18       At the same time, let's set up an Apogee-Perigee case.

19  That case has been worked up previously by Ms. Binis and by

20  Ms. Eskin.  It is in a place from a corporate standpoint

21  that it could be made ready for trial.

22       As far as Boston Scientific is concerned, it is my

23  understanding that the Pinnacle and the Obtryx cases by

24  December will be done, from a corporate standpoint that they

25  could also be consolidated.

1          We would only need to do some expert work because we

2     would want to be able to put certain, perhaps different

3     experts into the mix.  And we would need to do whatever the

4     number is of exemplars, some deposition discovery or other

5     discovery with regard to that, but place a date upon us.

6          I have suggested in what I submitted to the Court on

7     behalf of the plaintiffs that we start having consolidated

8     trials in February.  Perhaps I'm overly optimistic.  I may

9     be.  Some of my brethren say that I am.  But if we don't go

10    ahead and get started with something like that, then a year

11    from now we'll be talking about, "Well, how many bellwethers

12    have we tried?"

13         We think that it can be done concurrently.  We think

14    also at some point in time it may be appropriate for Your

15    Honor to consider some remands.  But we think that the

16    process of continuing with the bellwethers but, at the same

17    time, setting forth consolidations of cases can help move

18    this process forward.

19         The bottom line, Judge, is that without the fire being

20    to our feet and their feet, it won't happen.  At the end of

21    the day, we all have a common problem.  And you've heard me

22    say this before.  We all have a common problem in terms of

23    the cases, the number of cases, what should be settled, what

24    shouldn't be settled.

25         But something has to happen to cause engagement of

1    minds to solve that problem.  And we think putting

2    consolidation together with the bellwethers is something

3    that Your Honor could do.

4         The authority is there to do it.  We can start with

5    West Virginia.  That's the nidus of this.  It would be one

6    state's law that had to be applied there.  And you put the

7    burden upon us to come to you with cases.  And we're ready

8    to do that.

9         If we don't, I fear that -- and I'm almost as old as

10   you.  I may not have many more minutes left in this life

11   than you do.

12        DISTRICT JUDGE GOODWIN:  I have refused to divide

13   30,000 by 365.

14        MR. GARRARD:  I haven't either, Judge.  I don't

15   want to.

16        But if we don't, we'll be sitting here worrying about

17   this stuff in a year.  And there's really no reason why we

18   can't do these things that we are suggesting and move these

19   cases to a point where the two sides want to sit down and

20   come to a mutual resolution.

21        And one of the things that gives me, Judge, some reason

22   for optimism is this.  When we resolved the *Queen* case, as

23   Your Honor will recall that day, after that case was

24   resolved, Judge, Bard asked to speak to Ms. Queen and

25   Mr. Queen.  And we agreed.

1          And I want to say to Bard that -- and I told the

2     representative of Bard this afterwards.  The representative

3     of Bard, two of them -- one of them is in the courtroom

4     today -- went in to see the Queens.  And they expressed in

5     my mind sincere compassion towards the Queens.  And I

6     thanked them for that after that, and I sent an e-mail to

7     one of them after that thanking them for that.

8          That led me to believe that there is optimism because I

9     think that those representatives of Bard clearly recognized

10    the circumstance of the Queens, and they made a sincere

11    representation of that to them.

12         So, I have optimism that it could happen.  But I have

13    pessimism that you and I will be here having this discussion

14    a year from now if we don't go ahead and engage in a

15    consolidation approach.

16         I've tried a number of consolidations.  It can be done.

17    The Court is very good at instructing juries.  They do

18    listen.  I've tried consolidated mesh cases.  I've tried

19    consolidated asbestos cases all over this country.

20         In this city right now, there's a consolidated docket

21    that goes on every month of 20 cases.  It works.  Judge

22    Starcher, as Your Honor knows well, has written on this

23    issue as a Justice of the Supreme Court of West Virginia on

24    the need for consolidation.

25         We think it exists.  We think it's time.  And we urge

1    Your Honor to consider the proposal that we have made.  We

2    stand ready to modify it in any way that Your Honor deems

3    necessary.  We stand ready to suggest cases to the Court.

4    We urge that we start with West Virginia, and then we figure

5    out together with them and with Your Honor where we can go

6    from there, but we start.

7         Thank you.

8              DISTRICT JUDGE GOODWIN:  Who will speak for the

9    defendant?

10             MS. COHEN:  Good morning, Your Honor.

11             DISTRICT JUDGE GOODWIN:  Good morning.

12             MS. COHEN:  Thank you.  I will start and then I'm

13   sure others may want to chime in as well.

14        So, you know, I've often been in the court listening to

15   Mr. Garrard's vignettes.  And I'm sure that he has many

16   sympathetic plaintiffs.  And, of course, as he just said, we

17   on the defense side, our clients and all of us, are very

18   compassionate and sympathetic to these plights and these

19   stories.

20        But what I want to start with is just to remind the

21   Court and everyone that, that on the defense side looking at

22   the data, that for every plaintiff described like that,

23   there are probably 10 who have cases where there's either no

24   injury, where there's no causation, where there's no product

25   ID where the case shouldn't be filed.

1   And, so, we want to start with that point because I

2   think that's an important place to begin.  And, as you know,

3   Your Honor, from our submission -- and we submitted on

4   behalf of Bard and Sofradim our letter on September 16th.

5   And then we had a separate one --

6              DISTRICT JUDGE GOODWIN:  I did read that.

7              MS. COHEN:  And we had a separate one specific to

8   *Cisson* also.

9        But as we said there, we think one of the starting

10  points before we get to the consolidation issue -- and I

11  think Your Honor knows well how we feel about, about that,

12  but I'll talk a little bit about that.  We think there are

13  options and techniques and strategies and motion practice

14  that can be put into place to deal with some of these

15  issues, that is, culling down the numbers and reducing the

16  numbers of what we would call perhaps not frivolous cases,

17  but cases that do not come even close to the type that Mr.

18  Garrard's describing.

19       And then I guess the other thing I would mention is

20  when Mr. Garrard talks about this, you know, the overall

21  numbers and talks about West Virginia and talks about the

22  cases that are, I guess, prepared and ready to go to trial,

23  if you look at the actual data of the ones he's talking

24  about in West Virginia, and there are some 200 cases on the

25  list and I'll talk a little bit more about that, the ones

1    that follow, at least for Bard and the Avaulta set, there

2    are only 10 of them.

3         So, when we talk about the data and the numbers, the

4    ones that are truly in this category, there are very few

5    numbers of those cases.

6         And then overall when we look at our, you know, overall

7    data, and I'll talk a little bit more about that as well,

8    look at the overall data, there are probably, you know, some

9    8,000 cases just talking about the Bard data right now.  And

10   probably only one-eighth of the overall number of cases

11   relates to these types of cases, the Avaulta cases that Mr.

12   Garrard is talking about.  At least a third of the cases

13   relate to SUI cases, the Align products and others, that

14   have not been developed yet.

15        So, I think that's something that we need to think

16   about in terms of the data as we look at what's ready to go

17   to trial and what's ready to proceed.

18        But before I get to the actual numbers, I do want to

19   say also that in terms of the consolidation, and we've

20   talked a good bit about this in our submissions, you know,

21   we think the case law that Mr. Garrard cites to, a lot of it

22   does relate to asbestos cases.  A lot of the consolidation

23   examples that Mr. Garrard speaks about are cases where there

24   are common facts of law and common issues of fact under Rule

25   42.

1      But as I think we described in our submission, you

2  know, at great length, Your Honor, is that these cases, that

3  is, these types of cases, the mesh cases, as Your Honor saw

4  in our initial trials here, the issue is whether it be of

5  design defect or other issues.  There are very individual

6  issues at play, both in terms of the law and facts.

7      And even if we take -- I know Your Honor had told us in

8  chambers one day that the consolidation vision or what you

9  were considering or thinking about related to design

10  defects.  So, I'll take that as an example.

11      And as we said in our submission, when you look at the

12  design defect aspects, even within that, within a so-called

13  homogeneous category -- and we, obviously, take issue with

14  how homogeneous you can actually make any of these cases.

15      But if you look at a design defect case, taking

16  Ms. Cisson's as an example, you know, it's very hard to

17  think about even other Avaulta cases being homogeneous with

18  that if you look at issues like timing of implant, date of

19  implant, implanting physician, all of which goes to

20  state-of-the-art, state of mind, all of which are part of

21  the analysis related to a design defect issue.

22      Also, of course, as you saw with Ms. Cisson, there's an

23  analysis of the histology, the slides, the pathology, you

24  know, the actual mesh itself.

25      These are just some examples, some of which we've

1    talked about in our submission, that we think really cuts

2    against the ability of the Court but, more importantly, of

3    any jury to be able to look at these cases in a consolidated

4    manner.

5         There are just so many individual facts, not to mention

6    the legal issues, that we think would make it tremendously

7    difficult to try these cases in a consolidated way.  So,

8    that's one of the, obviously, the issues that we raised.

9         And even though Rule 42, as Mr. Garrard talked about,

10   does certainly give Your Honor the right to consolidate

11   trials, again, as we said in our submission, there are many

12   legal and logistical impediments to consolidating these

13   types of cases.

14        Again, I, I read over Judge Fallon's lengthy *Law Review*

15   article last night, as I'm glad to hear you did as well.

16   And he talked about -- and this really cuts sort of against

17   the consolidation issue, but also for the bellwether process

18   and MDLs generally, that these are -- there are many

19   individual issues that make bellwether trials really the

20   better tool and the more, you know, appropriate tool for

21   trying to get these cases to the ultimate resolution, to the

22   finish line, which I know is so vitally important to Your

23   Honor and that we've talked about many times.

24        The other thing I think is important to mention, we

25   said this in our submission, is not just are all these

1    logistical, factual, legal impediments and individualistic

2    factors that come into play here, but if we were to do --

3    and I think this is a really important part -- what Mr.

4    Garrard is talking about and I'm sure others will talk

5    about, if we were to take -- and I'll give some examples --

6    consolidated trials, whether we take an Align case from

7    Texas or we take, you know, one of AMS's products from, from

8    a given state, we're not going to make any more economical

9    or efficient -- I'll talk about the confusion and prejudice

10   aspect too.

11        But if you're just looking at efficiency and helping,

12   you know, as Mr., take Mr. Garrard's point, helping these

13   clients, you know, find their day in court, helping our

14   clients in defense get their day in court, this method is

15   only going to increase the number of trials and lengthen the

16   trial, the time period in my opinion, in our opinion.

17        And what I mean by that is -- let's just take an

18   example.  If we were to try some consolidated cases --

19   let's, let's go to Georgia, where I'm from, and we try a

20   design defect consolidated case.  And we drill down to some

21   homogeneous collection of cases, whatever the device is.

22        First of all, again, we take issue whether you can make

23   it homogeneous.  But, more importantly, even if we got

24   through the design defect part of the case, there's still in

25   many instances, unless it's dismissed from the case, a

1    failure to warn aspect.  That would have to be tried

2    discretely or separately.  There's still a causation piece

3    that, as you know, we spent considerable time at our trial

4    on that aspect of it.  There's still a damages part.  You

5    know, perhaps there's a punitive damage phase.  Hopefully

6    not.  But there are all those pieces.

7         And, so, if what we're looking for is judicial economy,

8    efficiency, getting everyone's day in court sooner, or

9    getting to an ultimate resolution a la Judge Fallon and the

10   bellwether process and what we all want to do in this room,

11   that's not going to help us.

12        Consolidated trials not only are going to be difficult

13   to manage factually, legally, and logistically, it's not

14   going to get us anywhere sooner because we're going to end

15   up with more trials.  And we're going to end up, you know,

16   just doing subsequent trials.  I can't even conceive of how

17   it would happen if we just focused on, say, the design

18   defect piece in one trial.

19        Now, Mr. Garrard and I have talked multiple times about

20   different permeations of this and what would we do.  And he

21   talked -- you know, he mentioned, say, exemplar plaintiffs.

22   Of course, we would have a strenuous objection to doing

23   exemplar plaintiffs that were not grounded and based on

24   specific plaintiffs because, again, we would think that that

25   would be essentially a time-waster.  We wouldn't be getting

1    anywhere.  We would be doing an issue without linking it to

2    a given plaintiff.  And that would have little, if any,

3    impact kind of on anyone's analysis of a specific case.  So,

4    exemplar plaintiffs we would say would not be, be helpful.

5        And, you know, of course, there's also the risk of

6    prejudice and confusion.  Mr. Garrard talked about, you

7    know, that he's been in consolidated cases.  And I don't

8    think the *Mentor* case that he referred to -- and others in

9    here know more about that -- actually went to verdict, but I

10   may be wrong about that.  It may have started, but I don't

11   think it went to verdict.

12       Is that right?

13       MR. GARRARD:  They did not.  The defendant decided

14   after a week of consolidated trial to settle the whole

15   docket.

16       MS. COHEN:  Well, -- and, of course, I don't know

17   the details of that.  But, again, that's not one that we saw

18   that it could go to trial.

19       The consolidation cases cited by the plaintiffs in

20   their submission, most of them relate to chemical exposures,

21   asbestos, that sort of thing.  And, so, I think it would be

22   very challenging for all the reasons in our submission to,

23   to put one of these cases into a consolidated case whether

24   with other plaintiffs or even on a specific issue.

25       Now, looking at -- I would say looking at the

```
 1   plaintiffs' numbers, because I received their submission
 2   yesterday and I think it's a good, good place to also focus,
 3   they are obviously arguing, as we heard this morning and we
 4   saw, for West Virginia, whether it be here or Huntington.
 5   And they are also arguing for cases that are -- I call it
 6   more mature.  They call it, I guess, ready for trial or are
 7   substantially complete, whatever the phrase is that they're
 8   using.
 9       So, if we look at those cases -- and, Your Honor, I
10   will pass this up.  I guess I can do it now or -- may I
11   proceed?
12                DISTRICT JUDGE GOODWIN:  Sure.
13                MS. COHEN:  Let me just pass this up to you.
14       We analyzed the plaintiffs' data they put forth.  So,
15   in the West Virginia data that Mr. Garrard, you know, cited
16   to the Court and I know through Kate provided us with some
17   of this information, what I think is really interesting
18   about this is actually looking at this, I think it supports
19   what we're sort of talking about here; that this would
20   actually make it more disjointed, more confusing, and create
21   more mini trials if we were to look at the West Virginia
22   data.
23       And what I mean by that is, so, there are two hundred
24   and -- you know, about 200 cases on the list.  And if you
25   look at this category of cases that Mr. Garrard is
```

1    suggesting are ready for trial and you take a single product

2    case -- this is just the Bard data.  And if you were to take

3    Mr. Garrard's suggestion, which is we should do West

4    Virginia plaintiffs, we should do the cases that are most

5    prepared and ready for trial, which would include the

6    Avaulta Plus, the Avaulta Solo, then you'd only really drill

7    down to about 10 cases that would be ready for proceeding to

8    trial under this scenario that Mr. Garrard's proposing and

9    with which we, you know, disagree, Your Honor.

10        So, again, looking at this and, and to quote one of our

11   witnesses from the *Cisson* trial who said, "The data does not

12   lie," the data does not lie.  The West Virginia data that

13   they've presented does not lie.  The data that we presented

14   does not lie.

15        And what that tells you is that what we're really

16   dealing with in the vast numbers that we're all concerned

17   about and thinking about how to best deal with, we have some

18   8,000, you know, 7,900 or so cases, again just talking about

19   Bard, and one third, or 33.3 percent of those relate to SUI

20   products.

21        And whether plaintiffs are ready to proceed with those

22   or not we really need to find out, I think, what we've

23   proposed in terms of motion practice.  And if they're not

24   willing to either dismiss those or have some of those, you

25   know, dismissed with motions, then we should be looking at

1   those types of cases that make up the vast majority of the

2   volume of the cases before the Court and think about

3   preparing those as opposed to sticking with the tried and

4   true, the ones that they chose to develop first, the Avaulta

5   ones which are very small in number and, again, wouldn't

6   really achieve any ultimate strategic goal if what we're

7   talking about is trying to find a way to get to the, to the

8   end result there.

9        So -- and I also, I guess, have a question in terms of

10  the plaintiffs' suggestion that they should select three

11  quarters and leave us with one-fourth.  I wasn't sure what

12  the basis was of that.  But we certainly if it comes to that

13  would object to that.  We think it should be fair and

14  equitable.

15       But, Your Honor, I think you've read our submission and

16  I'm happy to respond to questions, but I'd like to leave

17  some time for other people to address these issues as well.

18                 DISTRICT JUDGE GOODWIN:  Who else wants to talk?

19                 MR. MCCONNELL:  Your Honor, if I may just briefly

20  on behalf of AMS, I do promise to be brief.

21       I just got a look at the plaintiffs' submission when it

22  rolled in yesterday.  I found it a little bit surprising --

23  the one thing that was kind of surprising about it -- I

24  apologize if I'm wrong about this.  I don't think there's a

25  single West Virginia federal case cited there.  I don't

 1   think there's even a case cited from the Fourth Circuit.

 2       There's actually a lot of Fourth Circuit law on the

 3   issue of consolidation, not just whether it's appropriate

 4   and what the potential issues are in terms of confusion or,

 5   or prejudice.  But I think there's Fourth Circuit law on the

 6   issue of timing that a Court would not entertain the concept

 7   of consolidation until -- I think Ms. Cohen used the phrase

 8   "mature."  Until the particular action is mature, there's

 9   real danger in moving precipitously.  And we're not there.

10   I know AMS is certainly not there.

11       So, if, if -- I don't know what the Court's thinking of

12   going down this path.  If you do, we had asked in our

13   submission if we could brief it more fully.  I think there's

14   a lot more to be said, especially in terms of Fourth Circuit

15   law.

16       I will say particularly in terms of the way the

17   submission deals with AMS, and Mr. Garrard alluded to this,

18   that his proposal would be that there would be some sort of

19   consolidated trial with respect to Apogee and Perigee, which

20   are POP products.

21       And, of course, as Your Honor knows, in this litigation

22   we're kind of rounding the final curve in terms of fact

23   development and discovery on the SUI cases, not the POP

24   cases.  So, it seems to me that the particular suggestion

25   regarding AMS is more opportunistic than accurate.

1       But with that being said, Your Honor -- I think you

2    used the "bulldozer" phrase before.  I think consolidation

3    at this point would be a wrong turn by the bulldozer, and

4    we'd like an opportunity to talk about it more fully if we

5    could.

6       Thank you.

7          DISTRICT JUDGE GOODWIN:  Anybody else from

8    defendants?

9          MS. JONES:  May I just briefly, Your Honor?

10         DISTRICT JUDGE GOODWIN:  Ms. Jones.

11         MS. JONES:  Your Honor, I don't really wish to

12   address the issue specifically of consolidation beyond

13   saying that I simply believe it is premature at this point

14   in time to consider it for reasons that we set forth in our

15   motion that probably ought to be taken up during the Ethicon

16   time period, but that relate very specifically to the fact

17   that we now have thousands and thousands of claims about

18   whom we have very little information.

19       And we have cited in the motion, for example, that we

20   have 2,400 claims that have filed bankruptcy.  A percentage

21   of those may be barred by judicial estoppel.  Up to 7,200

22   claims may be barred by the statute of limitations.  We have

23   3,000 claims that are totally unsupported by any evidence,

24   medical evidence, compensable injury in the sense that it

25   hasn't been -- the medical records haven't been attached to

1    the PPFs thus far.

2        And we have provided for Your Honor -- and Mr. Aylstock

3    is going to consider, we'll get back with Your Honor -- a

4    schedule under which we would provide the names and

5    identities of those parties subject to what we believe is

6    either dismissal or an order to show cause why if it's a

7    statute of limitations, judicial estoppel, lack of competent

8    injury, whatever ought to be resolved.  And let's get

9    this -- the number of cases down first to what are truly

10   cases that may have some merit in this case that are not

11   barred.  That's the first thing.

12       The second thing that I want to say to Your Honor is

13   that there is one thing that the plaintiffs have said that I

14   agree with, and I'd like it to go on the record.

15       Plaintiffs say in their record that there's really no

16   need for further corporate discovery on these issues.  And I

17   want you to know that Ethicon and Johnson & Johnson

18   stipulate to that fact.

19           DISTRICT JUDGE GOODWIN:  Thank you, Ms. Jones.

20           MS. JONES:  And, and, Your Honor, if I could, I'd

21   like to introduce our client, Lisa Warren, from Johnson &

22   Johnson who is here today.

23           DISTRICT JUDGE GOODWIN:  Ms. Warren.

24           MS. WARREN:  Thank you.

25           MS. JONES:  The third and final thing that I wish

1    to give to Your Honor, and I do have a -- I'm cutting

2    through this because I have a PowerPoint that contains all

3    of these numbers.  But we did go back and look specifically

4    at the West Virginia numbers as they relate to Ethicon.

5        And what we found was that out of the 221 claims that

6    supposedly were West Virginia claims, only 93 of those were

7    truly West Virginia residents.  Fewer than that said West

8    Virginia was the appropriate venue.  A hundred and

9    twenty-seven of those plaintiffs -- it's the last, the last

10   two pages, Your Honor.  A hundred and twenty-seven of those

11   plaintiffs were from other states.

12       But then if we look at the breakdown of the products

13   that are involved from West Virginia, it is a total

14   mismatch.  The plaintiffs have selected or suggested a

15   consolidated trial of Prolift plaintiffs.  And there are

16   only three Prolift-only plaintiffs on this list according to

17   the information that we have.

18       So, with all due respect, I don't think the trial of

19   any three Prolift plaintiffs consolidated or otherwise in

20   West Virginia is going to accomplish the objectives that

21   Your Honor would hope to accomplish.

22       And we think we have proposed in our motion another

23   substitute venue, a procedure that is at least worth

24   considering for moving these cases along as we move forward

25   with the bellwether cases.

1          Thank you, Your Honor.

2          DISTRICT JUDGE GOODWIN:  Thank you, Ms. Jones.

3      I would ask, to the extent that your color copy machine

4  is available, if you could make several more copies of that.

5  I think distribution of this to the plaintiffs more broadly

6  might be of assistance.

7          MS. JONES:  I have a couple of other copies here

8  and we'll make them available to anyone who wants them.

9  Thank you, Your Honor.

10         DISTRICT JUDGE GOODWIN:  All right.  Any other

11 defendant?

12         MR. ADAMS:  Robert Adams for Boston Scientific.

13     Your Honor, to follow up on Ms. Jones's last point

14 regarding if we went down the road of consolidation, would

15 it be effective, Boston Scientific actually is in a similar

16 situation in that out of -- according to the Court's

17 records, there are 222 West Virginia cases.  Our records

18 show actually 147 of those are actually plaintiffs who

19 reside in West Virginia.  But within that pool, there are

20 only five Pinnacle cases.

21     So, again, consolidating that type of case I don't

22 think makes any sense in the broad scheme of things.

23     Also, especially with respect to Boston Scientific, I

24 would suggest that the entire thought of consolidation is

25 way premature.  We haven't even got up to bat.  The

```
 1   bulldozer hasn't even got out of the yard yet with respect

 2   to us.

 3              DISTRICT JUDGE GOODWIN:  We're heading your way.

 4              MR. ADAMS:  Oh, I know that.  And, you know,

 5   frankly, Your Honor, I think, again, we probably should have

 6   had a study group regarding the Judge Fallon article.  I

 7   think the entire bellwether process with respect to all of

 8   the defendants has to run its course.

 9       The big problem that I see with consolidation under a

10   number of different types of scenarios is that

11   consolidation, because of the broad factual issues, really

12   provides no benchmarking if you're interested in settlement.

13   It creates a lot of appealable issues.  And, again, at the

14   end of the day, it does not provide a very good benchmark.

15   And that's the reason why bellwether trials are effective.

16       Also along with the other defendants, if the Court is

17   going to consider this issue, you know, at a later date, we

18   ask to brief it more fully.

19       Thank you.

20              DISTRICT JUDGE GOODWIN:  To the extent that I

21   think we're all in agreement that we go forward with

22   bellwethers, I want you to know that I have open now the

23   week of October 8th.  And I am going to have some other

24   weeks open.  And any plaintiff and defendant who want to try

25   a case, just let me know and we'll try it that week.
```

1    So, there is no --

2         MR. CLARK:  Your Honor, may I proceed with our

3    completion?

4         DISTRICT JUDGE GOODWIN:  Oh, yeah.  Just a -- as

5    soon as I finish my rant.

6    There is, there is no one that wants to see these cases

7    dealt with expeditiously and judiciously and fairly more

8    than I do.  I recognize that some of the Bard cases are

9    quite old.  I recognize that some of the cases from even the

10   newer MDLs have injuries or illnesses that are of long

11   standing.

12   So, I understand the urgency of now, or whatever was

13   said, in terms of this litigation.  I'm looking for ways to

14   get there.  And so far -- and I'm -- I feel a little

15   schoolmarmish in saying this.  So far, you all are best at

16   telling me why you can't do something as opposed to telling

17   me how I can do something toward that end.

18   It is -- while Judge Fallon's article says that

19   bellwether trials are the, to use a word I hear a lot, the

20   gold standard, it is my experience that -- well, it's my

21   judgment that he didn't have you all picking the bellwether

22   trials.  He might have had, he might have had a different

23   opinion as to the efficacy of that process.

24   So, I'm looking for ways.  I have had meetings with

25   several plaintiffs and defendants groups because these are

1    separate MDLs, separate lawyers, separate products, and so

2    forth.  And I -- in individual MDLs I think people are

3    becoming more creative.

4        I'm going to go forward with the consideration of

5    consolidation and some other ideas that I have.  But I'm not

6    going to make up my mind tomorrow or next week.

7        But with that, Mr. Clark, you're on.

8            MR. CLARK:  Thank you, Your Honor.

9        Your Honor, I first want to start with the

10   consideration that this is not *Vioxx*.  And while Judge

11   Fallon did an excellent job on *Vioxx* and has gotten a great

12   deal of attention for it, it's -- many of -- we do believe

13   that while his papers and his writings are being brought

14   down on both sides of the argument on a regular basis, I can

15   only imagine he would grow weary from being quoted as to how

16   this should be done.

17           DISTRICT JUDGE GOODWIN:  Eldon likes to be quoted.

18   We went to baby judges' school together.

19           MR. CLARK:  Well, in *Vioxx*, we had one drug.  We

20   had 8,000 filings.  And he was able to do bellwethers based

21   upon that one drug and plaintiffs that he thought were

22   representative that actually moved litigation forward.

23       In this litigation, we hear about a few products on a

24   regular basis.  You hear about the six defendants.  Mostly

25   you hear about the four defendants.  Sometimes you only hear

1    one or two regularly.  But when you consider the gravity of

2    the filings, you've got to consider also that we are now in

3    excess of 80 different products.  And we lose that in this

4    conversation.

5         Yes, there may have been 8,000 filings in *Vioxx*.  And,

6    of course, there was a tolling agreement that kept that from

7    swelling beyond that.  But here we are now with thirty-one

8    thousand, thirty-two thousand cases filed in your court.

9         There are cases that are started but not filed that

10   could swell that number in the fifty to sixty thousand range

11   quickly in the first quarter of next year.

12        And, so, when we quote a single case that all of this

13   came from, when we talk about *Vioxx* or we talk about *Serzone*

14   or we talk about *Paxil* or *Zoloft* or any of the others that

15   we learn from in our pharmaceutical backgrounds, and we talk

16   about a judge that's been sent a particular case, a *Zoloft*

17   case, for instance, where there's 400 cases on file, and the

18   gravity of the work that judge has to undertake, and then

19   when that case settles, everybody gives a round of applause

20   for the fact that that court got it done.

21        When we argued to the JPML, both sides, most everyone

22   here believed that vaginal mesh should come here.  And we

23   talked about vaginal mesh at JPML as if it was a single

24   court, as if it was a pharmaceutical drug, not a whole bunch

25   of them, certainly not 80 products.  We hadn't considered

1    the gravity of what would occur.  We didn't have any idea

2    the numbers of cases that would eventually be filed.

3         And, so, those cases, I believe, unwittingly on our

4    part, swelled to where they are.  They've clogged your

5    docket.  We're having to figure out how a district clerk can

6    even file the cases, much less how they can be handled.

7         And, yet, at the same time, we're attempting to apply

8    the bellwether model of a single product case.  And

9    expectations then are that somehow or another, that there's

10   going to be magically a settlement that occurs, or that

11   there's going to be some sort of resolution.

12        I don't disagree with Ms. Jones.  There are cases that

13   have been hastily filed because when we're required to work

14   in haste, while we have large numbers of cases that are

15   referred to us for handling, we can't go through every

16   detail.

17        They say no tolling agreement.  We have statute of

18   limitations considerations.  We file cases that have to be

19   filed.  And, yes, we apologize for that.  In most situations

20   where lawyers have made mistakes, they haven't gotten the

21   records timely, haven't done the homework that you would

22   expect them to do if they had time to do it.  But we can

23   deal with that.  We can deal with that with motions that are

24   filed.

25        There needs to be a summary judgment filed on statute

1    of limitations at some point.  We can't file it.  But when

2    it is filed, you'll hear evidence and determine when the

3    world became aware that mesh was a problem, not just when

4    the letter was sent to doctors or not just when the FDA may

5    have mentioned something in a writing, but when the world

6    found out.

7         And the plaintiffs are charged with the responsibility

8    of knowing that there is a relationship.  We can brief that

9    for you.  We can argue it in front of you.  We can make a

10   decision on that.

11        But that's not an argument against bringing cases

12   together for resolution, nor is there an argument that there

13   are cases that don't properly identify the product.  Of

14   course, those cases are a problem.  The Court has already

15   addressed that with its most recent orders.  I'm sure we'll

16   address it again in the future.

17        We have a difficult time coordinating all this because

18   of the numbers of products and the looming deadlines.  That

19   problem is going to continue because we have been told

20   there's going to be no ability to toll.

21             DISTRICT JUDGE GOODWIN:  Could I interrupt you a

22   second because I think this is very important.  I don't view

23   filing lawsuits with no information or foundation as a

24   lawyer's mistake.  I view it as a clear violation of Rule

25   11.

1        MR. CLARK:  Sure.

2        DISTRICT JUDGE GOODWIN:  And I will take

3   appropriate action when a motion is filed.

4        MR. CLARK:  And we've recognized that in your

5   previous orders, Your Honor.  And I think that you'll

6   probably find that those in this room that are aware of

7   those circumstances will not be those you'll be addressing.

8   At the same time, there are cases that will not make the

9   trip.

10       They will -- we'll get into those cases.  We'll find

11  out things about them, about the mode of failure, about the

12  type of product, about the plaintiffs themselves that cause

13  those cases to become non-compensable for whatever reason.

14  That will happen as it happens in every litigation.

15       In *Vioxx*, since we've been continuously talking about

16  this, many of those cases were paid very low amounts in a

17  settlement or nothing in some circumstances.  Every

18  settlement that's ever been done in this space addresses

19  those type of problems.  It is not our desire to have

20  clients paid that are not deserving.

21       And, so, when we ask you to consider consolidation,

22  yes, of course, we start here in West Virginia.  And I --

23  we, we agree.  The numbers in West Virginia are low.  And

24  they're, they're cumbersome to deal with because they are

25  low.

1          DISTRICT JUDGE GOODWIN:  You've got some pretty

2     high numbers down in your home state.

3          MR. CLARK:  Yes, we do.  We have high numbers in

4     my home state and all the other larger areas of

5     concentration you would expect.

6          It's my suggestion, Your Honor, and I've been charged

7     with and asked to address requesting a road map from you,

8     where we will go beyond just basic consolidation.

9          And, of course, under 1404 and 1407, you have the right

10    to be able to transfer under 1404 or remand to the home

11    district under 1407 any group of cases that are, in your

12    opinion, homogenous and are ready to be transferred.

13         In our opinion, what we believe should be done is that

14    you should take some type of plan that addresses other

15    Article III judges in those districts to determine whether

16    or not either you can travel or they're willing to accept

17    part of your docket because if your docket swells to where

18    it is, there's not, there's not a judge that's in touch with

19    this process in the country that isn't aware of the problem

20    that you have.

21         There are courts -- some of the courts in Texas, for

22    instance, are bogged down with criminal and other issues

23    down on the border.  But there are many courts with so few

24    filings, I believe they would be receptive.  There's other

25    courts around the country that would do the same thing.

1    If we don't do that, then I -- my concern is this

2    bottleneck that is being created is going to have us right

3    back here doing this again this time next year.  If it can

4    be done contemporaneous, we believe West Virginia should

5    become the model.

6    We believe you should take your, your rulings on

7    *Daubert*, your, your statute of limitations ruling once the

8    motions are made, any other type of information that becomes

9    the law of the case.  The JPML then would consider those

10   that would be transferred under 1407.  You would directly

11   transfer any 1404 cases that were filed directly here.  You

12   would put homogenous cases in places where judges are

13   receptive to help you with what now is the largest MDL in

14   the country.

15   If you look at the 281 MDLs that exist today, more than

16   half of them have double-digit numbers; 24 cases, 54 cases,

17   75.  Very few have in the thousands.  And none at this

18   point -- even asbestos is not over 10,000.  And asbestos is

19   the only MDL that will be larger than this one in the

20   history since 1968.

21   We ask for these extraordinary measures because it's

22   not possible that this Court can create enough of a process

23   that will bring us together.  We need a road map as to how

24   we can move to those other jurisdictions with your, with

25   your paving the road by making those phone calls and putting

1    that in place and, and transferring only the cases that you

2    feel are ready to go so that there's no question that those

3    cases are ready to go and you have a receptive judge to help

4    you with those.

5              DISTRICT JUDGE GOODWIN:  Mr. Clark, one of the

6    things in this case -- you've got a lot of experience and

7    you can help me with this.  As I just said, I've got a lot

8    of weeks in this year that I'm not busy with you all.  And

9    my other docket -- I don't do criminal cases now because my

10   son's prosecuting people.  I've got time to work on your

11   cases.  What I've got is for you all to get them ready.

12   You've got to sort them out and get them done.

13       The fact of the matter is that this problem of medical

14   records being available is not a small problem.  The problem

15   of getting the cases somewhere near ready is not a small

16   problem.

17       I can't imagine at the rate we're going that I would

18   have cases by this time next year that I could send trial

19   ready in a big batch because we're not -- everybody's --

20   everybody is focusing on process issues, manipulating -- and

21   I don't mean that as a slam toward any particular person or

22   side -- manipulating whatever we put in place, and not on

23   getting to the end of the process.

24       I have six MDLs.  There are differences between them.

25   You've pointed out that we've got a lot of products within

1  those six MDLs.  And you're right, I think, that a lot of us

2  didn't consider the product issue and what impact that might

3  have.

4      But we've, we have got to move along quicker on sorting

5  the wheat from the chaff and getting some cases ready for

6  trial of some sort.  And we're not doing that.  And I'm

7  going to do that.

8      It's just that it's been my experience in dealing with

9  good lawyers like you and others that if you're properly

10  motivated, you can come up with a better scenario than I

11  can.

12      I will tell you that -- and I will have to use Mrs.

13  Fife as my witness -- that I've had some pretty wild

14  scenarios that have occurred to me in the past three weeks.

15  And she's fallen out of the chair two or three times.

16      I'll throw one out so you just understand how crazy

17  it's gotten.  I've said, you know, I can just set a

18  scheduling order in every single case with deadlines and

19  nobody can stop me, and nobody will stop me.  And I will

20  enforce them with sanctions.  I could do that.

21          MR. CLARK:  True.

22          DISTRICT JUDGE GOODWIN:  But that's when she

23  blanched.

24      I want your help.  I understand what you're arguing for

25  here today.  I see the merit in the consolidation process.

1    I think I brought it up.  And I'm going to give it very

2    serious consideration.  I didn't bring it up just to hear my

3    head roar.

4        I understand the defendants' reservations about

5    consolidation.  I understand -- I didn't just fall off the

6    pickle boat.  I actually used to try cases back when people

7    tried cases.  I am more than willing to try some.

8        I need your help, all of your help, to put in place

9    protocols of some sort that move these cases toward

10   resolution; resolution by trial, resolution by settlement,

11   resolution.

12       As long as you're picking at each other -- and I'm --

13   again, the schoolmarm is coming out.  As long as you're

14   doing that, we're not getting anywhere.

15       Now, behind the scenes, I know there are better things

16   going on than I'm seeing right here in front of me because

17   I've met plaintiffs and defendants together.  I just want to

18   encourage that.

19       It doesn't do any good if I've got -- and I'll use the

20   term I've heard and plaintiffs' lead counsel can quarrel

21   with it later.  I've heard of these aggregators that, that

22   are calling lead counsel and saying, "Where's my money for

23   God's sakes?"  And they don't even know what the cases are

24   about that they sent you.

25       I'm not, I'm not picking on the plaintiffs.  I'm just

1    saying we have got to get a handle on this.

2        And I -- you know, I think that you have as many cases

3    as anybody in this MDL.  You have the experience and the

4    intellect capable of doing this.  I want you to lead, jump

5    in there and help me.  I want to get a resolution.

6        I'm going to take all your submissions on

7    consolidation, and then I'm going to make up my own mind

8    about what I'm going to do and where I'm going to do it and

9    with what products.

10        Another one of my schemes is I can take the TVT cases

11   in Texas.  And I can put together 200 or 300 cases.  And I

12   can consolidate them on the design theory.  I, I can do

13   that.  That's not an outrageous idea.

14        So, I'm giving it all thought and I will do something.

15   But the more help you can give me and the more you all stay

16   engaged in moving the ball forward instead of thinking that

17   the defendants are all of a sudden going to get out their

18   checkbooks and write a check, the sooner we'll get this

19   overwith.  They're not going to write a check until they

20   know what they're writing the check for.

21        MR. CLARK:  Your Honor, one last suggestion that

22   we believe is important.  And this is something that I

23   believe leads to resolution.

24        We have to have some type of expectation of discomfort

25   in the future on both sides.  And that discomfort will bring

1    us together.  There's no doubt in my mind.

2              DISTRICT JUDGE GOODWIN:  I can do that.

3              MR. CLARK:  My concern -- and we welcome it, Your

4    Honor.  But -- and, so, when it comes time to make these

5    decisions, we agree that when an SUI case is worked up, we'd

6    like to see it consolidated and put to trial.  When -- and

7    when POP cases are ready, if you want to do them

8    simultaneously, it just happens that the POP cases are ahead

9    of the SUI.

10       We're not asking that we get the advantage there.

11   We're saying do it simultaneously, make us both

12   uncomfortable.  And I believe that will bring us together.

13       Thank you.

14             DISTRICT JUDGE GOODWIN:  I'll give you an example.

15   And some of you are aware of this, and it will come up later

16   on this docket sheet.

17       When I set a bellwether case, I'm not inclined to

18   dismiss it without prejudice without some very good cause.

19   I'm just not going to do it.  We went through a great

20   process to get there.  I'm not doing it.

21       I didn't pick them.  You all did.  I didn't -- really,

22   everybody agreed to the process.  So, yes, I'll make you

23   uncomfortable.  We're, we're going to -- the bulldozer will

24   keep running.  I'm not -- I'm just not moving as much dirt.

25   I've got a big D-8 here and I need, I need a, I need to drop

1    the blade a little bit and get a bigger bite.

2         How am I doing on the analogy?

3              MR. CLARK:  With the exception of the direction

4    you're looking, Your Honor, we appreciate that.

5              DISTRICT JUDGE GOODWIN:  Can we go on to the next

6    item?

7         Yes, ma'am.

8              MS. MOELLER:  Debbie Moeller.  Can I just -- I

9    want to address one thing that, that was just said about the

10   pharmaceutical versus medical device cases.

11             DISTRICT JUDGE GOODWIN:  Uh-huh.

12             MS. MOELLER:  And there have been MDLs that I've

13   been involved in in which there were multiple, multiple

14   medical devices in a single MDL.  And if you look at the

15   individual MDLs here, the numbers were about the same.  And

16   the Court was able to manage it by bellwether cases.

17        And once the bellwether process was in place, the

18   plaintiffs couldn't dismiss their cases.  I mean, I think

19   the defendants have stood ready to, to go forward and try

20   these cases.

21        And one of the suggestions in the submission on the

22   Bard MDL is we think part of the reason that that happens is

23   we need to, to kind of separate, separate, the analogy, the

24   wheat from the chaff.  And, and we're bulldozing big fields

25   and we need to figure out what field we're in.  And I think

```
1    that --

2              DISTRICT JUDGE GOODWIN:  I couldn't agree with you

3    more.  And I made it clear I am moving forward with the

4    bellwether process.  I have open slots of dates.  And if

5    you've got a case ready to try and the plaintiff's ready,

6    call me.  We'll set your case.  I'm ready.

7         Okay.  Let's turn to Ethicon.  Let's deal first with

8    Prolift selections.  I understand there may be an issue as

9    to whether these selections should have been from cases

10   filed by January 1st.

11        Who, who will address that?

12             MS. JONES:  Your Honor, I think we've put that on

13   there, and I think we've kind of resolved it.

14        The plaintiffs identified two, I believe, Prolift

15   plaintiffs that at the time we had no information on.  In

16   fact, suit was actually filed on those two plaintiffs in the

17   last month or two.  I mean, it was so late.

18        We still don't have the information.  Mr. Aylstock

19   tells me it is in the portals, wherever that, those portals

20   are.  Whether they're between me and him, they're someplace.

21        And I have told him that if we get that information and

22   it is, in fact, there and in order, we won't raise it.  If

23   we have an issue, we'll come back to Your Honor.

24             DISTRICT JUDGE GOODWIN:  Okay.  I like to skip

25   things.
```

1    The next item is an update on stipulations entered.

2  Two stipulations have been entered.  One I entered related

3  to the corporate structure.  That was under 63.  Judge

4  Eifert entered one related to the documents in the hernia

5  and mesh litigations.

6    Somebody want to talk about that?

7        MR. AYLSTOCK:  Your Honor, that's correct.

8  There's another one on the, on the griddle and that is the

9  pathology protocol that's going to hopefully help us both

10  when, when the explants happen, the best way to divide the

11  tissue, and so forth.

12    And that does flow right into our first trial case

13  which is the *Lewis* case.  It was only recently devised.

14  There is pathology.  There is explanted mesh.  But the

15  hospital has it.  So, that flows into a request to perhaps

16  move the trial date and the corresponding expert deadlines.

17        DISTRICT JUDGE GOODWIN:  This is currently set for

18  January 14th?

19        MR. AYLSTOCK:  Yes, Your Honor.

20        DISTRICT JUDGE GOODWIN:  And *Brown* is the first in

21  the second round.  It's set for May 27th?

22        MR. AYLSTOCK:  Yes, Your Honor.

23        DISTRICT JUDGE GOODWIN:  And a motion to dismiss

24  is pending in that without, without prejudice.  I think I

25  made clear what I think unless Ethicon doesn't oppose it.

1    MS. JONES:  Well, Your Honor, to the extent that

2    we need to, we, we do oppose the motion to dismiss without

3    prejudice.  We believe that discovery has been done.

4       When we were approached by plaintiffs' counsel, it was

5    on the grounds that they couldn't travel and they had

6    medical issues.  And I offered to go down and take a *de bene*

7    *esse* deposition, or even to ask Your Honor to go to Alabama

8    to try the case.  And --

9         DISTRICT JUDGE GOODWIN:  I've never been to

10   Alabama.

11        MS. JONES:  Well, I was told that they were, that

12   they were going to file the motion nonetheless.  And they

13   filed it.  And my view of it is if they can't try it now,

14   they can't ever try it.  It ought to be dismissed with

15   prejudice, and we ought to be entitled to our costs.

16        DISTRICT JUDGE GOODWIN:  Why don't I look at the

17   papers on it and I'll make a decision.  But I, I think

18   counsel for the plaintiff knows how I'm leaning.

19        MR. AYLSTOCK:  Yes, Your Honor.  And we'd be happy

20   to try a case in Alabama.  I'm from lower Alabama.

21        DISTRICT JUDGE GOODWIN:  Can we --

22        MR. AYLSTOCK:  So, we -- this, this case --

23        DISTRICT JUDGE GOODWIN:  Are there any good

24   football games coming up?

25        MR. AYLSTOCK:  There's a few, Your Honor.  This

1  case may present one of those unique circumstances given the

2  psychological issues.

3          DISTRICT JUDGE GOODWIN:  I'll certainly look at

4  it.

5          MR. AYLSTOCK:  Thank you, Judge.

6          DISTRICT JUDGE GOODWIN:  Do you all have anything

7  else on that?

8          MR. AYLSTOCK:  No.  To the extent that -- you

9  know, there's some items here about request for

10  supplementation and expert discovery and so forth.  To the

11  extent the Court might be amenable to, to moving those

12  deadlines, I think the rest of the agenda can simply be

13  disposed of.  We'll await your order on that.

14          DISTRICT JUDGE GOODWIN:  Do you agree with that,

15  Ms. Jones?

16          MS. JONES:  I do, Your Honor, if the -- if, in

17  fact, the, the deadline is moved three or four weeks, I

18  think that eliminates any problem.  If not, we may be back

19  talking to Your Honor.

20          DISTRICT JUDGE GOODWIN:  All right.  We'll do

21  that.

22          MR. AYLSTOCK:  Thank you.

23          DISTRICT JUDGE GOODWIN:  All right.  Well, I'll

24  skip to the end of the Ethicon agenda and go to Boston

25  Scientific.  The only item on their agenda is a general

1    update and progress.

2        Who will report?  Does it fall to you?

3            MR. ADAMS:  I'd be happy to, Your Honor.  There's

4    really nothing to report.  We're moving forward and getting

5    our four bellwether cases ready for trial.  Our trial is

6    currently set for February 11th.

7            DISTRICT JUDGE GOODWIN:  I think you owe me a

8    docket control order.

9            MR. ADAMS:  No.  We submitted that, I believe, 10

10   days ago.

11           DISTRICT JUDGE GOODWIN:  Okay.

12       Well, let's go to Bard because I haven't talked with

13   Mr. Garrard for a long time.

14           MR. GARRARD:  We are --

15           DISTRICT JUDGE GOODWIN:  We've talked about a lot

16   of this stuff.  I know -- I'm sorry.  I didn't mean to

17   interrupt you.  I know Ms. Cohen wants to talk about shotgun

18   complaints.  I think I've made my views known on that,

19   but --

20           MR. GARRARD:  I understand your views, Your Honor.

21   Ms. Cohen asked for that to be on the docket.

22           MS. COHEN:  Well, Mr. North is going to address

23   that, but just one quick report, Judge.

24       And this may not have been clear from what I said and

25   Ms. Moeller said earlier but, as you know, I'm, I was sort

 1   of a new --

 2          DISTRICT JUDGE GOODWIN:  I'm sorry?

 3          MS. COHEN:  I was a new, a new person put in the

 4   Bard litigation this year, but there were only five

 5   bellwether cases that had been worked up in terms of

 6   discovery.

 7       And, so, going back to what we talked about earlier,

 8   you know, in terms of having cases ready to try, there

 9   really were only five that were discovered.  I mean, I would

10   propose perhaps getting together with Mr. Garrard after this

11   and talking about, you know, putting together somekind of a

12   schedule for some other group of cases.

13          DISTRICT JUDGE GOODWIN:  I encourage you to do

14   that.

15          MS. COHEN:  And we can work on that.  And I would

16   just state again that of the five cases that were discovered

17   and ready for trial, plaintiffs dismissed two of those.

18       And, so, that's part of our, you know, issue now when

19   it comes to why we can't jump into the October space and

20   fill it because basically the only other case that's left is

21   *Jones* which is ready for trial in November.

22          DISTRICT JUDGE GOODWIN:  Since I'll be seeing you

23   all in a couple weeks, I'll let you try to work out a path

24   forward.  There was a time when you were so tied up in

25   trial --

1        MS. COHEN:  Right.

2        DISTRICT JUDGE GOODWIN:  -- that some of these

3   process matters were something I didn't think I could push

4   you on.  But you've worked well together up till now.  I

5   expect you to continue to do that.

6        MR. GARRARD:  We stand ready from our side to

7   submit to the Court some proposed consolidated cases to try.

8        MS. COHEN:  And we stand ready to propose some

9   bellwether trials.

10       MR. GARRARD:  Well, that --

11       DISTRICT JUDGE GOODWIN:  And both of you can

12  propose cases that you will work up for discovery.

13       MS. COHEN:  Exactly, Your Honor.  And I do think

14  we do need to do that because we're out of, out of cases

15  right now.

16       MR. GARRARD:  A consolidated case serves as well

17  as a bellwether, Your Honor.  I don't think there's anything

18  else from --

19       DISTRICT JUDGE GOODWIN:  I understand your

20  argument and I've only read half of your submission, but I

21  bet you've covered most of it.

22       MR. GARRARD:  I did, Your Honor.

23       MS. COHEN:  And, Your Honor, Mr. North may have

24  something to add on the shotgun complaints.

25       DISTRICT JUDGE GOODWIN:  Mr. North.

1          MR. NORTH:  Yes, Your Honor.

2      I know you have addressed the shotgun complaints.  We

3  just want to put it on the record how bothersome this is to

4  us, as I think it is to many of the defendants.  And we'll

5  probably be coming back to the Court after the filings are

6  complete on this.

7      As of this moment, Bard has approximately 5,800

8  plaintiffs that do not involve the Sofradim or TSL product.

9  And out of that 5,800 plaintiffs, 1,600 have no identified

10  product involved.

11      So, it is a matter of great concern to us and we just

12  wanted to put that on the record.

13          DISTRICT JUDGE GOODWIN:  It should be of great

14  concern to the plaintiffs who filed a complaint like that

15  because the, the response from the Court will be

16  appropriate.

17      AMS?  The only item is a new schedule for the first

18  bellwether trial and some adjustment for the internal

19  deadlines.

20      I met yesterday with the parties in AMS.  We had a very

21  productive meeting.  With regard to the rescheduling of the

22  December trial, I think we've got that pretty close to

23  worked out.  And there will be a trial date in early spring.

24      Either side have anything to add to that?

25          MS. FITZPATRICK:  Nothing from the plaintiffs,

```
 1    Your Honor.

 2              DISTRICT JUDGE GOODWIN:  All right.

 3         Coloplast.  I met this morning with the, both parties

 4    in the Coloplast litigation.  Since I have been

 5    schoolmarmish all morning, I think I -- you know, that's

 6    very gender neutral for me, isn't it.

 7         We had a very productive meeting, and I want to brag on

 8    the lawyers in Coloplast.  They've developed a protocol and

 9    a methodology going -- a path, as Mr. Clark would say, for

10    going forward within their MDL that I find very good.

11    They've -- it seems to be working well for them.

12         I'm not saying that it would work for everybody, but it

13    is a very well thought-out, complete, careful protocol.  And

14    they're moving forward quickly.

15         Just so everybody knows that as good as it is and as

16    carefully as they're working, I've set a deadline of the end

17    of the year.  And if it hasn't resulted in a substantial

18    resolution by that time, there will be an extraordinarily

19    abbreviated scheduling order put in place.  And they know

20    that.

21         Cook.  The first item is the status or the result of

22    the 30(b)(6) deposition of the Cook representative.

23         Does anybody want to report on that?

24              MR. ANDERSON:  Sure, Your Honor.  Ben Anderson.

25              DISTRICT JUDGE GOODWIN:  All right.  Mr. Anderson,
```

1    go ahead.

2            MR. ANDERSON:  All right.  Ben Anderson on behalf

3    of plaintiffs.  Thank you, Your Honor.

4            DISTRICT JUDGE GOODWIN:  Yes.

5            MR. ANDERSON:  The 30(b)(6) deposition, as you

6    know, was agreed upon so that we tried to come to the proper

7    party defendants.  That occurred less than 48 hours ago.

8    So, we are just now obtaining the transcript and the

9    exhibits from that so that as leadership we can vet that.

10           We did have a breakfast meeting this morning.  We have

11   had numerous meet-and-confers, as you know, with Cook

12   counsel over the last few weeks and the last couple of

13   months in trying to resolve numerous PTO issues and

14   housekeeping matters in order to set the foundation for the

15   case going forward.

16           And as you know, this is a crucial part of that which

17   affects all of our master pleadings and our discovery and

18   whatnot.

19           So, we do believe that after the meeting this morning

20   that we're moving closer.  And what we're trying to do is

21   see if we can craft a stipulation that will cover the

22   various entities to ensure that we have proper insurance

23   coverage and whatnot, and that we have the proper ones --

24   the last thing we want to do is to have to engage in a

25   motion practice and involve the Court any further than it

1   already is.  So, we hope that by early next week we have

2   some sort of stipulation in place.

3               DISTRICT JUDGE GOODWIN:  Yeah.  I need a super

4   short deadline on that.

5               MR. ANDERSON:  Okay.

6               DISTRICT JUDGE GOODWIN:  Actually, Judge Eifert

7   does.

8               MR. ANDERSON:  Today is Thursday.  How does

9   Tuesday sound?

10              DISTRICT JUDGE GOODWIN:  That's fine.

11              MR. ANDERSON:  So, we hope to have something by

12  then agreed upon.  If not, we would ask for an immediate

13  briefing schedule or a conference with Your Honor, whichever

14  you would prefer.

15              MR. KING:  Your Honor, Doug King for Cook.  In

16  that regard, we have actually already tendered to the

17  plaintiffs a proposed order that was based on the AMS/ENDO

18  order which we -- I suggested again to Mr. Anderson this

19  morning that I don't see how he's prejudiced by not agreeing

20  to it.  So, --

21              DISTRICT JUDGE GOODWIN:  Judge Eifert is available

22  in person and by phone.  And let's get this done in the next

23  couple days.

24              MR. KING:  Thank you, Your Honor.

25              MR. ANDERSON:  Thank you, Your Honor.

1          DISTRICT JUDGE GOODWIN:  I guess -- I also need

2    the entry of the PTO related to the profile form fact sheet.

3          MR. KING:  We agreed on that this morning, Your

4    Honor.  The Pre-Trial Order Number 7 that we had tendered to

5    them, they, we talked about and they've accepted it.

6       Correct?

7          MR. CRUMP:  That's correct, Your Honor.

8          DISTRICT JUDGE GOODWIN:  Next status conference is

9    scheduled for Thursday, November 7th, at 12:00 p.m.  No

10   lead, liaison, or high muckety-muck counsel for either side

11   will be excused absent good cause.

12         MR. CRUMP:  Your Honor, --

13         DISTRICT JUDGE GOODWIN:  Yes, sir.

14         MR. CRUMP:  -- I'm sorry to interrupt, Judge, but

15   unfortunately I think we have reached an impasse on the

16   protective order that is listed on the agenda.

17      The plaintiffs essentially were, were fine with

18   entering protective orders that had been entered in previous

19   litigations.  However, the defendants, in our opinion, have

20   substantially changed the provisions and the terms of the --

21         DISTRICT JUDGE GOODWIN:  Judge Eifert will meet

22   with you in my conference room immediately following this.

23         MR. CRUMP:  Thank you, Judge.

24         MR. KING:  Thank you, Your Honor.

25         DISTRICT JUDGE GOODWIN:  Anything else to come

1   before the Court?

2           MR. GARRARD:  No, sir.

3           DISTRICT JUDGE GOODWIN:  All right.  Court's

4   adjourned.

5       (Proceedings concluded at 11:40 a.m.)

1          I, Lisa A. Cook, Official Reporter of the United

2    States District Court for the Southern District of West

3    Virginia, do hereby certify that the foregoing is a true and

4    correct transcript, to the best of my ability, from the

5    record of proceedings in the above-entitled matter.

6

7

8          s\Lisa A. Cook                    September 26, 2013

9             Reporter                            Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25