## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

IN RE: AMERICAN MEDICAL SYSTEMS, INC.
PELVIC REPAIR SYSTEM PRODUCTS LIABILITY
LITIGATION

                                                                MDL No.  2325

-----------------------------------------------------------------
THIS DOCUMENT RELATES TO ALL CASES

---

### DEFENDANT'S OMNIBUS RESPONSE TO MOTIONS TO QUASH SUBPOENAS

### I.      INTRODUCTION

Recently, Defendant American Medical Systems, Inc. ("AMS") propounded third-party subpoenas upon Otto Fisher, One Point Orthopedic and Neurosurgical Group, MedStar Funding, and Daniel Christensen.  The subpoenas seek discovery about an apparent scheme to create fraudulent medical records specifically for vaginal mesh cases before this Court.  Somewhat surprisingly, Plaintiffs have moved to quash all four subpoenas, though all were directed to third parties.[1]  In addition, Christensen and his MedStar Funding (collectively, "Christensen") have moved to quash the subpoenas addressed to them.  AMS files this omnibus brief to respond to both pending motions.[2]

Though the motions differ in some respects, their core arguments are the same:  both argue that the subpoenas seek information that is irrelevant, burdensome, and protected.  As

---

[1] Plaintiffs have standing to object to subpoenas issued to third parties only to the extent that they assert privilege with respect to the documents and testimony sought by the subpoenas. *See, e.g., Bare v. Brand Energy & Infrastructure Services,* 2013 WL 5285374 at *3 (D. Utah Oct. 25, 2012).  Plaintiffs' relevance and burden arguments should therefore be disregarded.

[2] Fisher, through his counsel, has agreed to a date for his deposition, and his One Point Orthopedic and Neurosurgical Group has not moved to quash the subpoena directed to it.

explained in detail below, the events that provoked the subpoenas leave no doubt that AMS seeks relevant, producible information and documents. Movants' arguments are without merit, and the Motions to Quash should be denied.

## II.  FACTUAL BACKGROUND

Contrary to movants' apparent misunderstanding, AMS is not simply seeking discovery related to so-called "litigation funding," or to agreements to purchase the accounts receivable of surgeons who have already performed mesh revision procedures. Instead, the subpoenas that are the subjects of the pending motions were prompted by a phone call AMS's counsel received one day in late August.

On August 30, AMS's outside counsel received a call from Andrew Cassidenti, M.D., a urogynecologist who, on certain occasions, has functioned as a consultant to AMS.[3]  Dr. Cassidenti reported that, on approximately July 15, 2013, he received an e-mail from info@Doc-Net.org bearing the subject line, "Vaginal mesh removal cases" and seeking surgeons experienced and interested in vaginal mesh removal.[4]  Dr. Cassidenti responded to the e-mail, stating that he was very experienced in mesh removal and seeking further information.  In response, Dr. Cassidenti received an e-mail from Otto Fisher, providing a phone number and asking that he call to "discuss this opportunity."[5]

Dr. Cassidenti was on vacation, and called Mr. Fisher when he returned on August 5. Asked if he was a doctor or a lawyer, Mr. Fisher responded, "I am neither.  I am an entrepreneur."  He explained that he needed a surgeon in southern California and in Las Vegas to

---

[3] Dr. Cassidenti's affidavit ("Cassidenti aff.") is attached as Exhibit A.

[4] Cassidenti aff., Ex. A., at ¶ 3.  The e-mails to and from Dr. Cassidenti are attached collectively as Exhibit 1 to his affidavit.

[5] Cassidenti aff., ¶ 4.

perform mesh removal surgery at outpatient surgery centers.  He would pay $2,500.00 per case, "whether it took five minutes or two hours," and whether mesh was found or not.[6]

It was Mr. Fisher's next statement that prompted the subpoenas at issue.  Mr. Fisher stated, *"There is a federal judge in West Virginia that needs to see key phrases in the operative report like 'defective mesh,' 'bunched-up mesh,' and 'mesh erosions.'"*[7]  Dr. Cassidenti immediately asked, "You are not telling surgeons what to dictate in an operative report, are you?"  Fisher responded, "No, but it's just a game and we have to play it."  Dr. Cassidenti stated that he did medical-legal work for both plaintiffs and defendants in malpractice cases, and Fisher responded, "So then you know it's just a game."[8]  Fisher asked for Dr. Cassidenti's CV, and told Dr. Cassidenti that Dan Christensen, Fisher's funding arm attorney, would be calling him.[9]  Concerned that Fisher was engaged in a scheme that could harm women, Dr. Cassidenti decided to continue corresponding with Fisher to gather further information.[10]

Fisher immediately began pressuring Dr. Cassidenti to become involved in his scheme.[11]  From August 6 through August 12, Fisher sent several texts and e-mails seeking Dr. Cassidenti's CV, asking for referrals to other Las Vegas surgeons, and demanding that Dr. Cassidenti speak to Mr. Christensen, the funding arm attorney.[12]  Though Fisher had previously mentioned a one-page contract, he now stated, "There is no contract."  In a text message, he warned, "I'm holding on to these Vegas patients by a thread.  Don't delay too long," and promised, "It's $50,000 to u

---

[6] Cassidenti aff., ¶¶ 5 – 7.

[7] Cassidenti aff., ¶ 8.

[8] Cassidenti aff., ¶ 8.

[9] Cassidenti aff., ¶ 11.

[10] Cassidenti aff., at 12.

[11] Cassidenti aff., ¶ 15.

[12] Cassidenti aff., ¶¶ 15 – 17.

*(sic)* just waiting there ready."[13]

On August 15, Daniel Christensen called Dr. Cassidenti.[14]  He stated that his company, MedStar funding, was in the business of funding mesh lawsuits through a process called "factoring."[15]  Christensen confirmed that patients were referred by plaintiffs' attorneys involved in mesh litigation, and that his business involved funding mesh removal surgeries in exchange for contingent returns in the event that plaintiffs won their lawsuits.[16]

Dr. Cassidenti told Mr. Christensen that he was troubled by Fisher's requirement that Dr. Cassidenti include specific phrases in his operative report for the benefit of "the  federal judge in West Virginia," and Fisher's comment that "it's just a game."  Mr. Christensen responded that Dr. Cassidenti must have misunderstood, but Dr. Cassidenti responded that "Otto was very clear" and that he "did not misinterpret him."[17]

Dr. Cassidenti stated that he was not comfortable having lawyers dictate the language of his operative notes, and emphasized that he would not include anything that was not truthful. Mr. Christensen responded, ***"You would not be helping the patients if you fix them but don't help them win their mesh lawsuits,"*** and reiterated that Dr. Cassidenti ***"needed to get his head around what the patient wants, which is to win the lawsuit."***[18]  Mr. Christensen concluded that Dr. Cassidenti was not a "good fit" for the "program," and Dr. Cassidenti agreed.[19]

---

[13] Cassidenti aff., at ¶ 19.

[14] Dr. Cassidenti's contemporaneous notes of his conversation with Mr. Christensen are attached as Exhibit 2 to his affidavit.

[15] Cassidenti aff. ¶ 20.

[16] Cassidenti aff. ¶23.

[17] Cassidenti aff., ¶ 24.

[18] Cassidenti aff., ¶ 25.

[19] Cassidenti aff. ¶¶ 26-27.

Dr. Cassidenti had no further contact with Fisher or Christensen after the August 15 call.[20]  On September 17, Dr. Cassidenti learned that his name and office address were listed on the web site Surgicalassistance.com[21], which advertised surgeons who agreed to perform mesh removal surgery without compensation until the patient won a mesh lawsuit.  Dr. Cassidenti called the phone number listed on the web site, learned that Otto Fisher given his name to the site owner, and demanded that his name immediately be removed.[22]

### III.    ARGUMENT

Plaintiffs and Christensen argue that AMS's subpoenas should be quashed because they seek information that is irrelevant and protected, and because compliance with the subpoenas would be unduly burdensome.  In addition, Christensen argues that he was served too late to allow adequate time to respond.  None of these arguments has merit, and the Motions to Quash should be denied.

#### A.    The Subpoenas Seek Information That Is Unquestionably Relevant

Under Rule 26 of the Federal Rules of Civil Procedure, "[u]nless otherwise limited by court order, . . . [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ."  Fed. R. Civ. P. 26(b)(1).

Simply put, if any notation in any plaintiff's medical record resulted from any "deal" with the treating physician, this fact is critical to AMS's defense, and AMS is entitled to discovery to learn whether this is the case and for which plaintiffs.  The explanation is obvious: Plaintiffs' suits are based on their claims of mesh-related injury.  These claims depend on the

---

[20] Cassidenti aff., ¶ 28.

[21] Surgicalassistance.com has a YouTube video promoting vaginal mesh revision/removal performed under a "Letter of Protection" – no fee collected until a lawsuit is won.  This is a link to the video: http://m.youtube.com/watch?v=D0FUM3UyHmo&desktop_uri=%2Fwatch%3Fv%3DD0FUM3UyHmo

[22] Cassidenti aff., ¶ 30.

Plaintiffs' medical records and on experts' opinions based on those records. If a plaintiff's record is tainted by comments the treating physician was instructed to include in order to be paid for his services, the credibility of the records is destroyed, expert opinions based on the record lose weight, and the merits of the Plaintiff's claim are diminished. If this is the case for any plaintiff, AMS must know it to defend against that plaintiff's claim. If it is the case for many plaintiffs, the implications for this MDL are far more sweeping. Moreover, contrary to Plaintiffs' argument, privacy concerns are not implicated, as the subpoenas seek information about Plaintiffs who have already placed their medical conditions at issue before this Court.

In addition, the deal proposed to Dr. Cassidenti raises questions about the propriety of the contemplated surgeries. Offering a flat fee regardless of the length (five minutes or two hours) or result (mesh retrieved or not) of the surgery suggests that women whose treating physicians have not recommended revisions are being funneled to "mass revision" providers, where surgery is performed on them whether they need it or not, after which they can sport revisions and tainted medical records to raise the value of their litigation claims. The details of these referrals, including payment arrangements and lists of involved physicians and patients, are essential to AMS's defenses to claims involving revisions.

In short, Mr. Fisher's and Mr. Christensen's statements to Dr. Cassidenti have raised critical and troubling questions. AMS and this Court are entitled to know the answers, and Rule 26 clearly permits the discovery AMS seeks.

**B.**    **The Subpoenas Do Not Seek Protected Information**

### 1. Work Product

Plaintiffs argue that AMS is not entitled to obtain any responsive documents that are in the possession of Christensen or MedStar Funding, as all are either available from other sources

or were obtained from Plaintiffs' counsel and are therefore protected work product.  In particular, Plaintiffs argue that documents they provided to MedStar Funding contain their impressions of the merits of particular cases and are therefore entitled to heightened protection as "opinion work product."

The work product doctrine protects documents prepared by or for a party "in anticipation of litigation or for trial." Fed.R.Civ.P. 26(b)(3).  In order for a document to be protected, "the primary motivating purpose" behind the creation of the document must be to aid in pending or impending litigation. *Hoover v. Trent*, 2009 WL 484875 at *2 (N.D.W.Va. Feb. 25, 2009). Work product protection is not absolute.  Even if it is established, it can be overcome if the party seeking the materials shows: (1) a substantial need for the materials, and (2) an inability to obtain the substantial equivalent of the information without undue hardship. *See, e.g., BRC Rubber & Plastics, Inc. v. Continental Carbon Co.* 2013 WL 1281835 at *2 (N.D.Ind. March 26, 2013).

As AMS has explained, it is not seeking Plaintiffs' evaluations of the merits of their cases.  AMS is seeking documents related to the possibility that Fisher, Christensen and their companies, at Plaintiffs' behest, have arranged to funnel women seeking mesh removal surgeries to a select group of surgeons, and to pay a flat fee for those surgeries in return for the surgeons' agreement to include particular phrases in their operative notes.  Such documents, even if prepared by Plaintiffs' counsel, were not prepared "to aid in litigation" – they were created to subvert it.  However, even if there were an argument that such documents were work product, the protection would be overcome by the critical need for AMS and this Court to understand the existence,  nature, extent and effect of the "deals" of the sort offered to Dr. Cassidenti, and the identities of the surgeons and patients involved.

### 2.    Attorney-Client Privilege

Plaintiffs' "attorney-client privilege" argument similarly lacks merit.  Plaintiffs argue that communications from their attorneys to Fisher, Christensen and their companies are protected by the attorney-client privilege because these third parties have a "common interest" in the outcome of the litigation.

Traditionally, the "common interest doctrine" permits parties to the same or related litigations, represented by separate counsel, to be shielded by a common privilege "umbrella" while they work toward shared litigation goals. *See, e.g., Hunton & Williams v. U.S. Dept. of Justice* 590 F.3d 272, 277 -278 (4th Cir. 2010) ("The common interest doctrine permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims."). Plaintiffs cite one case -- *Devon IT, Inc. et al., v. IBM Corp.,* 2012 U.S. Dist. LEXIS 166749 (E.D. Pa. Sept. 27, 2012) – in which the United States District Court for the Eastern District of Pennsylvania held that plaintiff and a litigation funding company shared a common interest in the outcome of the litigation.  This novel extension of the attorney-client privilege finds no support in the Southern District of West Virginia or in the Fourth Circuit.   Moreover, in *Devon IT,* the Court made clear that "[l]litigation strategy, matters concerning merits of claims and defenses and damages would be revealed if the documents were produced," *id.* at *5, and that it was invoking the doctrine to "protect[] communications between parties with a shared common interest in litigation strategy." *Id.*

The *Devon I.T.* case is distinguishable for a very simple reason:  AMS does not seek documents related to litigation strategy or the merits of plaintiffs' claims.  It seeks discovery related to apparent attempts to procure tainted medical records through financial arrangements with physicians, and to possible schemes to "manufacture" mesh removal/revision cases where

treating physicians did not recommend such surgeries.  There is no colorable argument that Plaintiffs and the subpoena recipients share any legitimate "common interest in litigation strategy" that would be revealed by the subpoenaed documents and information.  To the extent that Plaintiffs' attorneys have communicated with Fisher, Christensen or their companies, these are communications with non-parties and are not protected by the attorney-client privilege.

### The Crime/Fraud Exception

Even if there were arguments that responsive documents were protected by the attorney-client privilege (which there are not), the crime/fraud exception would prevent Plaintiffs and Christensen from invoking this protection.

Under the crime/fraud exception, the attorney-client privilege offers no protection where there is a prima facie showing that (1) the 'client' was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme; and (2) the documents containing the privileged materials bear a close relationship to such a scheme. *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999).  In this case, even if Plaintiffs did share a legitimate "common interest" with Fisher, Christensen and their companies, the account set forth in Dr. Cassidenti's affidavit makes a prima facie showing of an apparent fraud, satisfying the Fourth Circuit's test.   Thus, even if this illusory attorney-client relationship did exist, the crime/fraud exception would destroy any privilege for the documents and communications AMS seeks.[23]

### 3.    Trade Secret

Christensen and MedStar argue that its funding formulas are trade secrets, protected from discovery.  The details of the proprietary formulas MedStar uses to value cases for funding purposes are not necessarily responsive to the subpoenas.  To the extent that such formulas are

---

[23] The exception applies with equal force to the work product doctrine. *See, e.g., Chaudhry*, 174 F.3d at  403.

reflected in otherwise-responsive documents, they can be redacted if appropriate.

## C.   THE BENEFIT OF THE SUBPOENAS OUTWEIGHS ANY BURDEN THEY IMPOSE

Movants argue that searching for documents related to all plaintiffs would impose an undue burden.  Under Rule 45(c)(3)(A)(iv), determining whether a subpoena imposes undue burden requires "weighing a subpoena's benefits and burdens" and "consider[ing] whether the information is necessary and whether it is available from any other source." *Maxtena, Inc. v. Marks*, 289 F.R.D. 427, 439 (D.Md.,2012), citing 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2463.1 (3d ed. 2008).  *See also, e.g., Thompsons Film, LLC v. Does 1-6,* 2013 WL 4805021 at *2 (N.D.Ill. Sept. 6, 2013) (to evaluate whether a subpoena imposes an undue burden, the court asks whether "the burden of compliance would exceed the benefit of production of the material).

In this case, AMS has learned of the possible existence of an insidious and fraudulent scheme, but has no idea how many plaintiffs have participated, how they have been induced to participate, which physicians are involved, and how many sets of medical records have potentially been tainted.  If AMS and the Court are to gain this knowledge, there is no alternative to searches by the subpoena recipients for responsive documents related to every plaintiff.  The discovery is essential, it is not available from any other source, and the benefit of production therefore outweighs any burden imposed by compliance with the subpoenas.[24]

## CONCLUSION

As Dr. Cassidenti has documented, surgeons are apparently being offered "deals"

---

[24] Christensen's final argument is that he and MedStar were served too late, with only days left before the compliance dates on the subpoenas.  In fact, Christensen evaded numerous attempts at service before he was finally served, substantially reducing his time to comply.  Nevertheless, AMS will work with Christensen and his counsel to arrange an extension of the production deadline and a new date for Christensen's deposition

involving referrals and payments in exchange for including specific phrases in plaintiffs' operative reports. The relevance to AMS's defenses, and the broader implications for the litigation, are beyond dispute, as is the necessity for all involved parties to ensure the protection of women who may be the ultimate casualties of such an 'entrepreneurial' scheme. AMS is entitled to the discovery it seeks, and the movants' arguments are without merit. The Motions to Quash should be denied.

Respectfully submitted,

/s/ Rachel B. Weil_____
Barbara R. Binis, Esquire (PA Bar #62359)
Rachel B. Weil, Esquire (PA Bar #49844)
**REED SMITH LLP**
2500 One Liberty Place, 1650 Market Street
Philadelphia, PA 19103-7301
(215) 241-7948 (Telephone)
bbinis@reedsmith.com
jkwuon@reedsmith.com
Lead Counsel for Defendants – MDL 2325

***Attorneys for Defendant American Medical
Systems, Inc.***

/s/ Michael J. Farrell_____
Michael J. Farrell, Esquire (WVSB # 1168)
Erik W. Legg, Esquire (WVSB # 7738)
**FARRELL, WHITE & LEGG PLLC**
914 Fifth Avenue
P.O. Box 6457
Huntington, WV  25772-6457
(304) 522-9100 (Telephone)
mjf@farrell3.com
ewl@farrell3.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

_/s/ Rachel B. Weil_____