IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

IN RE: AMERICAN MEDICAL SYSTEMS, INC.
PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY
LITIGATION

MDL No. 2325

_____

THIS DOCUMENT RELATES TO ALL CASES

**PRETRIAL ORDER # 91**
(Motion to Disqualify Catherine A. Matthews, M.D.)

This multidistrict litigation ("MDL") involves surgical mesh products designed, manufactured, marketed, and sold by American Medical Systems, Inc. ("AMS") to treat pelvic organ prolapse and stress urinary incontinence, and is one of six pelvic mesh MDLs currently pending in this court. The present dispute between the parties involves the identification of Dr. Catherine Matthews as an expert witness on behalf of AMS. Dr. Matthews is an Associate Professor and Division Chief for the Department of Urogynecology and Reconstructive Pelvic Surgery at the University of North Carolina at Chapel Hill. Plaintiffs move the court to disqualify Dr. Matthews from this litigation on the ground that she has a pre-existing relationship with Plaintiffs and is engaging in improper "side-switching." (ECF No. 902, 903). AMS has responded to the motion, (ECF No. 921), and the time for filing a reply memorandum has expired. For the reasons that follow, the court **DENIES** Plaintiffs' motion to disqualify Dr. Matthews.

I.     **Relevant Background**

On January 6, 2012, Dr. Matthews and two of her colleagues at the University of North Carolina met for approximately two hours with three attorneys representing Plaintiffs in pending mesh cases. At the time of the meeting, one pelvic mesh MDL existed, and one month later, three additional pelvic mesh MDLs were created, including this MDL. According to Mr. Henry Garrard, one of the attorneys present at the meeting, the participants discussed mesh litigation, injuries associated with pelvic mesh, complications seen by Dr. Matthews in her "mesh clinic," and her publications. (ECF No. 902-1 at 2). Mr. Garrard shared his "theories as to problems and defects with the mesh products," including degradation of polypropylene and scarification related to pore size, and "theories related to the litigation and trial" of cases involving pelvic organ prolapse and stress urinary incontinence. (*Id.*). In Mr. Garrard's view, he participated in the meeting "with the full expectation and understanding that Dr. Matthews would consider working as an expert witness for the Plaintiffs in all mesh litigation." (*Id.*). In fact, Dr. Matthews's two colleagues were subsequently retained as experts for the Plaintiffs. The University of North Carolina Physicians & Associates invoiced Plaintiffs' counsel $1,000 for the time spent by Dr. Matthews at the conference, and counsel paid the invoice.

Dr. Matthews's description of the meeting is slightly different. According to Dr. Matthews, she was aware that the three attorneys represented women alleging injuries from pelvic mesh; however, she was not informed that "the purpose of this meeting had to do with any particular pending lawsuit." Instead, she understood only that "the attorneys who convened the meeting were interested in learning about [her] experiences generally with pelvic mesh." (ECF No. 921 at 11). Dr. Matthews states that no specific

2

cases were discussed at the meeting; there was no mention of AMS or any other pelvic mesh manufacturer; and there was no conversation regarding any particular mesh product. (*Id.*). Rather, Dr. Matthews recalls that the discussion primarily concerned her professional qualifications and academic work at the Pelvic Mesh Clinic she co-founded at the University of North Carolina. She denies being provided with any documentation by Plaintiffs' counsel. Furthermore, she was not asked to be an expert witness for the Plaintiffs, was not provided with a retention or consulting agreement, and was not advised that the meeting was intended to be confidential. (*Id.* at 11-12). Finally, Dr. Matthews has no recollection of the attorneys divulging legal theories or strategies during the meeting and explicitly disputes that "any discussion took place around mesh product designs or 'defects,' degradation of polypropylene mesh, pore size of any mesh product, the facts in individual cases, or any individual plaintiff's injuries." (*Id.*).

The next contact between Plaintiffs' counsel and Dr. Matthews occurred three months later when counsel sent Dr. Matthews an email advising her that "there has been considerable activity in both the litigation and regulatory arenas." (ECF No. 902-1 at 7). Counsel informed Dr. Matthews that four pelvic mesh MDLs had been created and "[t]hings will be heating up fast." (*Id.*). Counsel also mentioned that in reviewing Dr. Matthews's credentials, he noticed her involvement in an AMS grant, and he needed further information to determine if there was a "potential for or appearance of conflicts." (*Id.* at 8). Approximately one month later, in May 2012, Dr. Matthews answered the email, explaining that she was a consultant to AMS on a sacrocolpopexy project and an investigator for a fecal incontinence product. (*Id.* at 902-1 at 5).

Dr. Matthews claims to have had no further contact with Plaintiffs' counsel after her May 2012 responsive email. More than a year later, she was approached by AMS and

asked to provide expert review in the AMS MDL. She agreed and recently was identified as an expert witness on AMS's behalf.

## II. Positions of the Parties

Plaintiffs argue that Dr. Matthews met with Plaintiffs' counsel and received confidential information regarding their cases and legal strategies. As a result, Dr. Matthews stood in a confidential relationship with Plaintiffs prior to being retained as an expert witness by AMS and should not be permitted to switch sides in this litigation.

To the contrary, AMS contends that a single, two-hour meeting, during which no retention letter was provided and no documentation was exchanged, does not give rise to a confidential relationship. AMS emphasizes that Dr. Matthews was not informed that the meeting was confidential, or that AMS was a defendant in the pelvic mesh litigation. Indeed, Dr. Matthews was not asked about her relationship with any of the pelvic mesh manufacturers at the meeting, did not sign a non-disclosure statement, and has no recollection of any particular case, mesh product, or legal strategy being discussed.

## III. Discussion

"A federal court has the inherent power to disqualify experts." *Rhodes v. E.I. DuPont de Nemours Co.,* 558 F.Supp.2d 660, 664 (S.D.W.Va. 2008) (citing *Grant Thornton, LLP v. FDIC,* 297 F.Supp.2d 880, 882 (S.D.W.Va 2004)). Nonetheless, disqualification is a drastic remedy that courts should use sparingly. *Hewlett-Packard Co. v. EMC Corp.,* 330 F.Supp.2d 1087, 1092 (N.D.Cal. 2004) (citations omitted). The burden of showing that disqualification is warranted rests with the party seeking disqualification and requires a "high standard of proof." *Rhodes,* 558 F.Supp.2d at 664 (quoting *Tessier v. Plastic Surgery Specialists, Inc.* 731 F.Supp. 724, 729 (E.D.Va.

1990)). When determining whether an expert's prior relationship with an adverse party justifies the expert's disqualification, the court asks two fundamental questions. *Id.* at 667. First, did the moving party have an objectively reasonable expectation of a confidential relationship with the expert? To answer this question, the court should consider whether: (1) the relationship between the expert and the adverse party was long-standing and involved frequent contacts; (2) the adverse party directed or funded the formation of an opinion by the expert; (3) the expert and adverse party entered into a formal confidentiality agreement; (4) the expert was retained by the adverse party for the purpose of assisting in the litigation; (5) a fee was paid to the expert by the adverse party; and (6) the expert derived specific ideas about the litigation from work done under the direction of the adverse party. *Id.*; *see also Syngenta Seeds, Inc. v. Monsanto Co.,* No. 02-cv-1331, 2004 WL 2223252, at *2 (D. Del. Sept. 24, 2004). Second, did the adverse party disclose to the expert confidential information that is sufficiently related to the instant litigation to merit disqualification? In this context, confidential information is "information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege,'" including such things as litigation strategy, strengths and weaknesses of the case, the role of experts at trial, and anticipated defenses. *Rhodes,* 558 F.Supp.2d at 667 (quoting *Hewlett-Packard Co.,* 330 F.Supp.2d at 1094). When both queries are answered in the affirmative, the expert usually should be disqualified. Otherwise, disqualification is generally inappropriate. However, before making a final decision, the court should also take into account the principle of basic fairness, as well as competing policy considerations. "The policy objectives in favor of disqualification include the court's interest in preventing conflicts of interest and in maintaining judicial integrity.

5

The policy objectives weighing against disqualification include maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions." *Novartis AG v. Apotex Inc.,* No. 09-5614, 2011 WL 691594, at *1 (D.N.J. Jan. 24, 2011); *also Rhodes,* 558 F.Supp.2d at 667-68 (quoting *Cordy v. Sherwin-Williams Co.,* 156 F.R.D. 575, 580 (D.N.J. 1994)). The availability of other experts and the burdens on the nonmoving party associated with retaining a new expert should also be considered. *Rhodes,* 558 F.Supp.2d at 668.

### 1. Did Plaintiffs have an objectively reasonable expectation of a confidential relationship with Dr. Matthews?

When examining each of the factors outlined in *Rhodes*, the undersigned answers this inquiry in the negative. First, the relationship between Plaintiffs and Dr. Matthews was not long-standing and did not involve frequent contacts. According to the record, Dr. Matthews engaged in one two-hour meeting with Plaintiffs' counsel at which two other physicians from her department were present. A few emails were exchanged between Dr. Matthews and Plaintiffs' counsel several months later, but the emails did not indicate that Dr. Matthews had entered into a formal working relationship with Plaintiffs. Actually, they suggest quite the opposite. The emails from counsel imply that they were still gathering information about Dr. Matthews to determine the existence of potential conflicts before retaining her services. Once Dr. Matthews explained her connection to AMS, Plaintiffs' counsel ended the communications. If an expert consulting arrangement had actually existed between Dr. Matthews and Plaintiffs, it strikes the undersigned as implausible that counsel would terminate the agreement by simply severing contact. Accordingly, Plaintiffs' failure to produce communications documenting the beginning or the end of a consulting agreement with Dr. Matthews

undermines their claim that such a relationship existed.

Second, Plaintiffs provide no evidence that they directed Dr. Matthews to provide a formal opinion on any aspect of the mesh litigation or that they paid her a retainer or other fee to generate such an opinion. Given that Plaintiffs did not identify particular mesh manufacturers or products at the time of the meeting, and did not thereafter supply Dr. Matthews with any medical records or other documents, she clearly did not have sufficient information to render an expert opinion; particularly, not an opinion that could be used at trial.

Third, no retention agreement, confidentiality agreement, or non-disclosure statement was tendered to and executed by Dr. Matthews. Dr. Matthews states that she did not understand the meeting to be anything more than a generic discussion about pelvic mesh. The lack of any documentation establishing the purpose of the meeting, and memorializing counsel's expectation that the discussions would be kept confidential, supports Dr. Matthews's perception.

Fourth, the evidence does not corroborate Plaintiffs' assertion that they retained Dr. Matthews to assist with the mesh litigation. Mr. Garrard's statements do not indicate that he and Dr. Matthews ever reached a meeting of the minds on her involvement in the MDLs. To the contrary, Mr. Garrard provides only his subjective belief that the purpose of the meeting was to see if "Dr. Matthews would consider working as an expert" for Plaintiffs. Clearly, Dr. Matthews did not agree at the meeting to be an expert, and there is nothing to establish that she was ever explicitly asked by Plaintiffs to provide that service. As Mr. Garrard confirms, Plaintiffs did retain Dr. Matthews's colleagues at a later date, and at least one of those physicians reviewed case-specific information and generated an expert report. However, this was not the situation

with Dr. Matthews. It appears from the evidence supplied, that the initial meeting was an opportunity for Plaintiffs' counsel to vet the three University of North Carolina physicians as potential experts. After the meeting, Plaintiffs collected additional information about Dr. Matthews, and probably about her colleagues as well, and chose to retain the other two physicians. Counsel's subsequent contacts with the other two physicians, especially when contrasted to their lack of contact with Dr. Matthews, corroborates her impression that she was never retained for the purpose of helping Plaintiffs with the mesh litigation.

Five, although a fee was paid for the time Dr. Matthews spent in the two-hour meeting, the record does not demonstrate that she was ever paid for a record review or to draft a written opinion. According to Dr. Matthews, she was never asked to do anything further for Plaintiffs after the January 2012 meeting. Therefore, the only payment received by Dr. Matthews was for an initial consultation.

Finally, there is nothing before the court suggesting that Dr. Matthews developed any particular ideas about the litigation as a result of work she performed for Plaintiffs. As indicated, Dr. Matthews believed the meeting was arranged to give Plaintiffs' counsel an opportunity to learn about her experiences at the Pelvic Mesh Clinic, not for her to perform expert services. Plaintiffs provide no evidence or argument to refute the reasonableness of Dr. Matthews's belief. Dr. Matthews apparently was not asked to research any particular topic, prepare a presentation, review and comment on issues of pore size and mesh degradation, or take any steps in anticipation of the meeting. Thus, the evidence substantiates nothing more than a "meet and greet" between Plaintiffs' counsel and three physicians from the University of North Carolina with experience in pelvic mesh. Plaintiffs' counsel did not take any steps to guard the confidentiality of

information shared during the meeting, nor did they make it clear that in their minds, the meeting constituted a private conference between a party to litigation and its experts. As previously stated, Plaintiffs apparently decided not to retain Dr. Matthews. As a result, they never provided her with medical records or other documents to review, and never obtained any opinions from her for use in pelvic mesh litigation, let alone opinions specific to products manufactured by AMS. "[I]n circumstances where the expert only performs an initial consultation, so a party can decide whether to retain the expert, the party generally cannot claim a reasonable expectation of a confidential relationship." *Northbrook Digital, LLC v. Vendio Services, Inc.,* No. 07-2250 (PJS/JJG), 2009 WL 5908005, at *2 (D. Minn. Aug. 26, 2009). Therefore, the undersigned finds that Plaintiffs did not have an objectively reasonable expectation of a confidential relationship with Dr. Matthews.

### *2. Did Plaintiffs disclose to Dr. Matthews confidential information that is sufficiently related to the instant litigation to merit disqualification?*

Although the lack of a confidential relationship between Plaintiffs and Dr. Matthews presumptively defeats Plaintiffs' motion, the undersigned also answers the second inquiry in the negative. Mr. Garrard states that he shared legal strategy and theories with Dr. Matthews, while she denies any recollection of same. Considering that no particular manufacturer of mesh, or specific mesh product, was discussed at the January 2012 meeting, it is not surprising that Dr. Matthews does not remember receiving confidential information. At the time of the meeting, litigation against AMS was in its infancy. The AMS MDL did not yet exist. Accordingly, the disclosures made by Plaintiffs' counsel to Dr. Matthews were likely nothing more than broad theories of liability and anticipated defenses as opposed to well-developed strategies specific to

mesh products manufactured by AMS. Certainly, counsel made no effort to protect his disclosures. Thus, it is reasonable for the court to conclude that whatever work product was shared with Dr. Matthews was not highly sensitive. Plaintiffs have the burden of showing that "specific and unambiguous" disclosures were made to Dr. Matthews that if revealed would prejudice Plaintiffs. *Surfcast, Inc. v. Microsoft Corporation,* No. 2:12-cv-333-JAW, 2013 WL 5435693, at *4 (D.Me. Sept. 30, 2013). This burden cannot be met with a "generalized and vague allegation that the expert knew 'mental impressions and trial strategies.'" *Novartis AG,* 2011 WL 691594, at *4. Therefore, the court finds that Plaintiffs simply have not established that they disclosed confidential information to Dr. Matthews sufficient to justify her disqualification.

### 3. *Fundamental Fairness and Policy Considerations*

Likewise, neither the principle of fundamental fairness, nor policy considerations weigh in favor of Dr. Matthews's disqualification. Plaintiffs apparently made the decision in May 2012 not to retain Dr. Matthews, and as a result, she had no further communications with them. At no time after the initial meeting did Plaintiffs' counsel have any substantive contact with Dr. Matthews regarding the mesh litigation. She was not privy to any of Plaintiffs' theories and strategies unique to AMS, and she received no written information from Plaintiffs' counsel. Therefore, denying Plaintiffs' motion does not offend the notion of fundamental fairness.

On the other hand, AMS apparently had no reason to believe that Dr. Matthews was retained by Plaintiffs when AMS first approached Dr. Matthews for an opinion. Dr. Matthews evidently had not performed any expert services in the litigation. Now that Dr. Matthews has been retained by AMS, performed an expert review, rendered opinions, and been identified as a trial expert, disqualifying her would be unfair to AMS.

Moreover, in light of Dr. Matthews's minimal contacts with Plaintiffs, which occurred very early in the AMS litigation, the undersigned finds that Dr. Matthews's appearance as an expert witness on behalf of AMS does not constitute a conflict of interest or undermine judicial integrity.

IV. **Conclusion**

Wherefore, for the reasons stated in this order, the court **DENIES** Plaintiffs' motion to disqualify Dr. Matthews. (ECF No. 902).

The court **DIRECTS** the Clerk to file a copy of this order in 2:12-md-2325 and it shall apply to each member related case previously transferred to, removed to, or filed in this district, which includes counsel in all member cases up to and including civil action number 2:13-cv-27477. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through the CM/ECF system or the court's website at http://www.wvsd.uscourts.gov.

**ENTERED:** November 1, 2013.

Cheryl A. Eifert
United States Magistrate Judge

11