# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

IN RE: AMERICAN MEDICAL SYSTEMS, INC.
      PELVIC REPAIR SYSTEMS
      PRODUCT LIABILITY LITIGATION      MDL No. 2325

---------------------------------------------------------------

THIS DOCUMENT RELATES TO ALL CASES

### PRETRIAL ORDER #215
(Motion to Modify Subpoena or for Protective Order
of Nonparties Surgical Assistance and Blake Barber )

Pending before the court is the motion of nonparties, Surgical Assistance and Blake Barber ("Barber") (collectively, "the nonparties"), to modify subpoenas served by American Medical Systems, Inc. ("AMS"), or in the alternative, for a protective order. (ECF No. 2259). AMS has filed a response to the nonparties' motion, and the nonparties have filed a reply. (ECF Nos. 2262 & 2298). The Court held a telephonic hearing on the motion on May 27, 2016. After reviewing the memoranda and hearing the arguments of counsel, the court **GRANTS**, **in part,** and **DENIES**, **in part**, the nonparties' motion to modify subpoenas, or in the alternative, for a protective order.

## I. Relevant Background

This multidistrict litigation ("MDL") involves pelvic mesh products manufactured, marketed, and distributed by AMS. The products include surgical mesh intended to be permanently implanted during operative procedures for the treatment of pelvic organ prolapse and stress urinary incontinence. The plaintiffs claim, in relevant part, that the mesh is defective, causing harm to the body and leading to complications, such as chronic

1

pain and scarring. Consequently, some of the plaintiffs have undergone surgical procedures to revise the implanted mesh, or to remove it altogether ("corrective surgery").

In the course of discovery, AMS learned that a portion of the plaintiffs had their corrective surgeries arranged and funded through third-party funding companies. According to AMS, these arrangements were frequently complex, often expensive, and occasionally unnecessary, as some of the plaintiffs receiving the funding had health insurance to cover similar procedures. AMS was stymied in its efforts to discover the details of the funding arrangements from the plaintiffs, who seemed to know little more about them than AMS. Confronted with a lack of transparency regarding a key element of damages, AMS began seeking information from nonparties, including Surgical Assistance and Barber, about the third-party funding of corrective surgeries. At issue were both the cost and the medical necessity of the procedures.

On March 11, 2016, AMS served subpoenas for testimony and records on the Records Custodian of Surgical Assistance and W. Blake Barber. (ECF No. 2259-1 at 1; ECF No. 2259-2 at 1). The subpoenas attached a list of nineteen categories of documents to be produced by the nonparties. The categories include documents memorializing or describing communications between the nonparties and any transvaginal mesh patients; documents identifying the telephone number and locations of any call centers working with or on behalf of the nonparties that received or made calls to transvaginal mesh patients; advertising and marketing materials created or used to discuss transvaginal mesh litigation with patients; documents related to the generation of leads for mesh lawsuits; documents related to the financing or funding of corrective surgeries; documents pertaining to ownership or financial interest in any of the aforementioned funding companies, call centers, or medical centers performing corrective surgeries;

2

documents memorializing communications between the nonparties and financers or funders of corrective surgeries, persons arranging corrective surgeries, and various doctors, some who performed corrective surgeries; documents describing any ownership or financial interest in the proceeds from any mesh litigation; documents identifying any companies or entities in which the nonparties hold an ownership interest; documents related to the referral, transfer, or sale of mesh litigation claims to law firms; and any medical and billing records received for any mesh patient who used an AMS mesh product. (ECF No. 2259-1 at 7-9; ECF No. 2259-2 at 5-7). The Records Custodian of Surgical Assistance was instructed to appear on April 21, 2016 at 10:00 a.m. at a location in Orlando, Florida and to bring the requested documents with him or her. (ECF No. 2259-1 at 1). Barber was instructed to do the same on April 22, 2016 at 10:00 a.m. (ECF No. 2259-2 at 1). The subpoenas included the standard information about the deponent's duties in responding, the protections afforded to the deponent, and steps to take in order to request quashal or modification of the subpoena.

On April 4, 2016, the nonparties filed the instant motion in the United States District Court for the Middle District of Florida. On April 28, 2016, the motion was transferred to this District. (ECF No. 2259-3 at 1-3). In the motion, the nonparties assert that Surgical Assistance "primarily factors (or acts in the capacity of a broker for factoring companies) receivables from medical providers who are seeking to increase or regulate their cash flow and reduce the risks of nonpayment from treating injured patients who have third party claims or lawsuits." (ECF No. 2259 at 1-2). According to the nonparties, Barber owns Surgical Assistance. (*Id.* at 2). The nonparties insist that they are not medical providers nor do they possess information regarding the medical necessity of any corrective surgeries undergone by the plaintiffs. (*Id.* at 2). They argue that the subpoenas

seek irrelevant information or protected trade-secret information. (*Id.* at 1). First, the nonparties claim that the information sought is irrelevant because it relates to "suspected wrongdoing" of the nonparties rather than the claims and defenses in this litigation. (*Id.* at 3-4). The nonparties contend that, although they may have purchased receivables from some of the plaintiffs' medical providers, information concerning those purchases is not relevant to this action. (*Id.* at 4). Second, the nonparties assert that the production of the requested documents would reveal their "pricing, marketing, business strategy, organizational structure, and transaction structure," all of which constitute protected trade-secret information. (*Id.* at 6).

In response, AMS argues that the nonparties understate their role in the corrective surgery process. AMS insists that the nonparties "have obtained personal medical information about women throughout the country who received mesh implants, compiled a database from that information, and sold 'leads' from that database to litigation funding companies, to doctors who perform potentially medically unnecessary explant surgeries at a significant markup, and to 'facilitators' who are paid to make travel, pre-op[eration], and billing arrangements for the explant surgeries—all in exchange for thousands of dollars in kickbacks (which are tacked on to claimed damages) whenever a woman undergoes mesh explant surgery paid for by a litigation funding company." (ECF No. 2262 at 1-2). AMS contends that it is entitled to discover information related to the plaintiffs' decisions to undergo corrective surgeries and the costs of such surgeries because that information is relevant to the reasonableness and medical necessity of the surgeries. (*Id.* at 15). With respect the nonparties' trade-secret argument, AMS asserts that the nonparties have failed to offer any concrete examples as to the harm that would befall the nonparties if they were required to produce the requested documents. (*Id.* at 18).

4

Furthermore, AMS avers that the existing MDL protective order (PTO 169) addresses any potential harm to the nonparties' business. (*Id.*)

The nonparties reply that AMS is improperly using discovery in this litigation to explore potential claims against a nonparty. (ECF No. 2298 at 2). They assert that they do not possess information regarding the necessity of the plaintiffs' corrective surgeries or the reasonableness of the plaintiffs' medical expenses. (*Id.* at 4-11). The nonparties also insist that AMS mischaracterizes their business model and deny convincing any of the plaintiffs to undergo corrective surgery. (*Id.* at 11, 13).

## II. <u>Federal Rules of Civil Procedure 26 and 45</u>

Federal Rule of Civil Procedure 45(d) sets forth the protections available to a person subject to a subpoena.[1] In particular, Rule 45(d)(3) outlines when a court *must* quash or modify a subpoena, when it *may* do so, and when the court may direct compliance under specified conditions. According to the rule, a court is "required" to quash or modify a subpoena that: "(i) fails to allow a reasonable time to comply"; "(ii) requires a person to comply beyond the geographic limits specified in Rule 45(c)"; "(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies"; or "(iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). The rule does not explicitly state that a court must quash or modify a subpoena where the information sought is irrelevant. However, "the scope of discovery allowed under a subpoena is the same as the scope of discovery allowed under Rule 26." *HDSherer LLC v. Nat. Molecular Testing Corp.*, 292 F.R.D. 305, 308 (D.S.C. 2013); *Singletary v. Sterling*

---

[1] Jurisdiction exists to resolve the motion as a result of the transfer of the motion to this court. In addition, jurisdiction to resolve the motion to quash or modify exists under 28 U.S.C. § 1407. *See In re Neurontin Marketing, Sales Practices, and Prod. Liab. Litig.*, 245 F.R.D. 55, 58 (D. Mass. 2007) (quoting *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 444 F.3d 462, 468-69 (6th Cir. 2006)).

5

*Transport Co.*, 289 F.R.D. 237, 240-41 (E.D. Va. 2012). In other words, "[a]lthough Rule 45(c) sets forth additional grounds on which a subpoena against a third party may be quashed, … those factors are co-extensive with the general rules governing all discovery that are set forth in Rule 26." *Cook v. Howard*, 484 F. App'x 805, 812 (4th Cir. 2012); *see also Barber v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 3:14-cv-27349, 2015 WL 6126841, at *5 (S.D.W.Va. Oct. 16, 2015) (citing *Cook*, 484 F. App'x at 812). Looking to Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case …." Fed. R. Civ. P. 26(b)(1). Thus, "[r]elevance is … the foundation for any request for production, regardless of the individual to whom a request is made." *Cook*, 484 F. App'x at 812. Indeed, the Fourth Circuit has recognized that a subpoena seeking irrelevant information may subject its recipient to an "undue burden" under Rule 45(d)(3)(A)(iv). *Id.* at 812 n.7; *see also HDSherer LLC*, 292 F.R.D. at 308 (recognizing that overbroad subpoena or subpoena seeking irrelevant information imposes undue burden on recipient).

In addition, Rule 45(d)(3)(B)(i) permits the court for the district where compliance is required to quash or modify a subpoena that necessitates disclosure of a trade secret or other confidential research, development, or commercial information." As an alternative, instead of quashing or modifying the subpoena, the court may order production of the information under specified conditions if the serving party shows "a substantial need" for the information "that cannot be otherwise met without undue hardship" and "ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(C). The subpoena recipient has the initial burden of demonstrating the confidential and proprietary nature of the information, and the recipient's historical efforts to protect it from disclosure. *Gonzales v. Google, Inc.,* 234 F.R.D. 674, 684 (N.D .Cal. 2006); *Compaq*

*Computer Corp. v. Packard Bell Elec., Inc.,* 163 F.R.D. 329, 338 (N.D. Cal. 1995). However, once that showing is made, the burden shifts to the requesting party to establish a substantial need for the information that cannot be met without undue hardship. *Id.*

Confidential commercial information, within the meaning of Rule 45(d)(3)(B)(i) and its counterpart Rule 26(c)(1)(G), is more than just routine business data; instead, it is important proprietary information that provides the business entity with a financial or competitive advantage when it is kept secret, and results in financial or competitive harm when it is released to the public. *Gonzales,* 234 F.R.D. at 684; *see also Diamond State Ins. Co. v. Rebel Oil Co., Inc.,* 157 F.R.D. 691, 697 (D. Nev. 1994) ("Confidential commercial information" is "information, which disclosed, would cause substantial economic harm to the competitive position of the entity from whom the information was obtained."). Examples of confidential commercial information entitled to protection under Rules 26(c)(1)(G) and 45(d)(3)(B)(i) include customer lists and revenue information, *Nutratech, Inc., v. Syntech Intern, Inc.,* 242 F.R.D. 552, 555 (N.D. Cal. 2007); product design and development and marketing strategy, *Culinary Foods, Inc. v. Raychem Corp.,* 151 F.R.D. 297, 305 (D. Ill. 1994); labor costs, *Miles v. Boeing,* 154 F.R.D. 112, 114 (E.D. Pa. 1994); and commercial financial information, *Vollert v. Summa Corp.,* 389 F. Supp. 1348, 1352 (D. Haw. 1975). Moreover, "[p]ricing and marketing information are widely held to be confidential business information that may be subject to a protective order." *Uniroyal Chem. Co. v. Syngenta Crop Prot.,* 224 F.R.D. 53, 57 (D. Conn. 2004) (citing *Vesta Corset Co. v. Carmen Foundations, Inc.,* 1999 WL 13257, at *2 (S.D.N.Y. 1999)).

As previously explained, a subpoena recipient may move to quash the subpoena

under Rule 45(d)(3).[2] "The burden of persuasion in a motion to quash a subpoena … is borne by the movant." *Jones v. Hirschfeld*, 219 F.R.D. 71, 74-75 (S.D.N.Y. 2003); *see also HDSherer LLC*, 292 F.R.D. at 308 ("[T]he burden of proof is with the party objecting to the discovery to establish that the challenged production should not be permitted."). The determination as to whether a subpoena seeks irrelevant information or imposes an undue burden is committed to the discretion of the trial court. *Hirschfeld*, 219 F.R.D. at 74.

Aside from quashing or modifying the subpoena, a court may also issue a protective order, for good cause, to protect the subpoena recipient from "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). A protective order may forbid the discovery sought, prescribe an alternative discovery method for obtaining the information sought, or prohibit inquiry into certain matters. *Id.* For example, Rule 26(c)(1)(G) specifically permits a court to issue a protective order requiring that trade secret or confidential commercial information "not be revealed or be revealed only in a specific way."

### III. Analysis

The nonparties assert that the subpoenas seek information that is irrelevant to the claims or defenses in this litigation, and therefore, the subpoenas should be modified. Rule 26(b)(1) does not precisely define relevancy. Certainly, information is relevant if it logically relates to a party's claim or defense. Although the rule was recently amended to

---

[2] Federal Rule of Civil Procedure 26(b)(2)(C) additionally requires a court to limit the "frequency or extent of discovery" otherwise allowed where "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"; "(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; or "(iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)."

remove language permitting the discovery of "*any matter* relevant to the subject matter involved in the action" (emphasis added) and "relevant information … reasonably calculated to lead to the discovery of admissible evidence," the rule in its current form still contemplates the discovery of information relevant to the subject matter involved in the action, as well as relevant information that would be inadmissible at trial. Fed. R. Civ. P. 26(b)(1), advisory committee notes to 2015 amendment. Accordingly, it remains true that "relevancy in discovery is broader than relevancy for purposes of admissibility at trial."[3] *See Amick v. Ohio Power Co.*, No. 2:13-cv-6593, 2013 WL 6670238, at *1 (S.D.W.Va. Dec. 18, 2013). Moreover, notwithstanding Rule 26(b)(1)'s recent amendment placing an emphasis on the proportionality of discovery, the discovery rules, including Rule 26, are still "to be accorded broad and liberal construction." *Eramo v. Rolling Stone LLC*, No. 3:15-MC-11, ___ F.R.D. ___, 2016 WL 304319, at *3 (W.D. Va. Jan. 25, 2016); *see also CTB, Inc. v. Hog Slat, Inc.*, No. 7:14-cv-157, 2016 WL 1244998, at *3 (E.D.N.C. Mar. 23, 2016).

The court has previously recognized that AMS is entitled to discover information about the sources that gave the plaintiffs advice regarding whether to undergo corrective surgeries, as well as information related to the funding of the corrective surgeries. (ECF No. 2262-5 at 3-4; ECF No. 1216 at 6). In contrast, the court has rejected AMS's effort to discover information concerning the amount that a medical factoring company pays to purchase receivables from those facilities that perform corrective surgeries and the amount that the medical factoring company ultimately receives when it then sells or

---

[3] Federal Rule of Evidence 401 provides that "evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

collects on the accounts. (ECF No. 1216 at 6-7). The court has also cautioned AMS that it will not be permitted to perform widespread discovery on how entities might be running an alleged "cottage industry" related to the transvaginal mesh litigation. *See Centola v. AMS*, 2:14-cv-29705, Dkt. No. 82 at 19 (Tr. of Telephonic Motion Hearing held on Apr. 14, 2016).

Keeping these parameters in mind, the court notes that AMS has produced evidence demonstrating that the nonparties compiled a database of women who received mesh implants and used that database to provide leads to funding companies and referrals to doctors in order to arrange corrective surgeries. For example, Andrew Fisher, a contract broker for a litigation funder, testified at his deposition that he received transvaginal mesh leads from Surgical Assistance. (ECF No. 2262-2 at 9). In exchange, Blake or Surgical Assistance received a commission for every lead that was funded by Mr. Fisher's employer. (*Id.* at 11). Mr. Fisher also recalled that Surgical Assistance employees had direct contact with transvaginal mesh patients. (*Id.* at 12). Similarly, M.Z. Bhojani, a manager of Women's Health Surgical Solutions, which facilitated the scheduling of corrective surgeries, testified that Surgical Assistance provided him with patients. (ECF No. 2262-3 at 28). He also agreed that Surgical Assistance was a "middleman" between the facilitating companies and the funding companies. (*Id.* at 34). At his deposition, Mr. Bhojani produced a questionnaire used by Surgical Assistance employees when speaking with mesh patients on the telephone. (*Id.* at 35-36; ECF No. 2252-4 at 15). Kerriann Herzog, a consultant for Women's Surgical Health Solutions, similarly testified that Barber was an "intermediary" between a facilitating company and a funding company. (ECF No. 2262-4 at 11). Additionally, Michael Hulse, M.D., testified that Barber referred mesh patients to him for corrective surgeries. (*Id.* at 30). Lastly, AMS states in its

response memorandum that it is aware of eighty women who underwent corrective surgeries "through the efforts of Surgical Assistance." (ECF No. 2262 at 13).

The court **FINDS** that much of the information sought by AMS's subpoenas is relevant to this litigation. The subpoenas do not evidence a crusade against the nonparties' business practice; instead, AMS reasonably seeks to understand the motivation behind the plaintiffs' decisions to undergo corrective surgeries and how those surgeries were funded. A rational place to start is with the beginning of the money trail— the first entity interacting with the plaintiffs before the decision to have a corrective surgery is made.

For instance, AMS seeks documents related to lead generation for mesh lawsuits, documents identifying call centers by location and telephone number, and documents memorializing or describing communications between the nonparties and any transvaginal mesh patients. Plaintiff Judy Buzzell testified that she was called three times by a call center and told that there were problems with her sling and that she could receive financial help to have the sling removed. (ECF No. 2262-1 at 45-54). After one of the calls, Ms. Buzzell visited a local physician, Joseph Benoit, M.D., who examined Ms. Buzzell and opined her sling did not need to be removed. (ECF No. 2262-1 at 54; ECF No. 2262-5 at 14, 16). Ms. Buzzell testified that the following weekend she experienced significant pain, and she subsequently decided to obtain a second opinion in Georgia. (ECF No. 2298-6 at 6-7). After being examined by Dr. Hulse in Georgia, Ms. Buzzell elected to have her sling removed. (*Id.* at 9-10). Ms. Buzzell's testimony demonstrates the relevancy of AMS's requests—any information concerning the communications between Ms. Buzzell and call centers, like those operated by Surgical Assistance, that could have spurred Ms. Buzzell's decision to seek corrective surgery are logically related to the issue of medical necessity.

11

Similarly, the lead generation documents may contain information relevant to the call center's decision to contact particular plaintiffs to inquire about corrective surgery. To extent that AMS asks the nonparties to produce recordings between the call centers and the plaintiffs, AMS and the nonparties should meet and confer on that issue to discuss the details and costs of identifying and producing those recordings. AMS may wish to consider limiting its request to a sampling of those recordings, or offering to pay some or all of the cost of reviewing and producing the relevant recordings.

AMS also appropriately inquires into the nonparties' ownership or financial interest in companies involved in contacting mesh patients and scheduling, funding, or performing corrective surgeries. AMS is entitled to understand any potential financial motive that the nonparties may have possessed in signing up the plaintiffs for corrective surgeries for two related reasons. First, this information permits AMS to gauge the credibility and motives of the nonparties or their agents when interacting with the plaintiffs. Second, the information may demonstrate the extent to which plaintiffs were pressed, if any, into considering corrective surgeries. For the same reasons, documents related to the referral, transfer, or sale of mesh claims to law firms, and documents describing the nonparties' ownership or financial interest in the proceeds from any mesh litigation are also relevant to this litigation.

Furthermore, AMS's requests seek documents relevant to the issue of damages. In particular, AMS subpoenaed documents related to the financing or funding of corrective surgeries; documents memorializing communications between the nonparties and financers or funders of corrective surgeries, persons arranging corrective surgeries, and various doctors who performed corrective surgeries; and any medical and billing records received for any mesh patient who used an AMS mesh product. These documents are

required to determine the reasonableness of the costs associated with the corrective surgeries that the plaintiffs underwent. Indeed, counsel for the nonparties acknowledged at oral argument that Surgical Assistance typically receives a portion of the overall sum of money dispersed by funding companies to mesh patients who subsequently undergo corrective surgeries. As such, Surgical Assistance is directly involved in contributing to the costs of the patients' correctives surgeries, which is relevant to the issue of damages here insofar as any of the plaintiffs underwent corrective surgeries with the aid of Surgical Assistance.

Notwithstanding, the court agrees with the nonparties that AMS's subpoenas are overly broad in some respects. First, all of the above information should be limited to the plaintiffs in this litigation who received AMS products. (*See* ECF No. 2262 at 13 n.7). Second, AMS should only be permitted to discover the nonparties' ownership or financial interest in those entities engaged in the recruitment of mesh patients as well as those connected to scheduling, funding, and performing corrective surgeries. Therefore, the nonparties need not produce documents identifying all companies in which the nonparties hold an ownership or financial interest. Third, AMS is not entitled to discover from the nonparties all advertising and marketing materials created or used in relation to transvaginal mesh litigation. Rather, AMS should only be permitted to discover advertising and marketing materials related to the corrective surgery process that were distributed by the nonparties to potential corrective surgery patients who received AMS products. This information would be relevant to the issue of how the plaintiffs initially decided to explore corrective surgery.

Lastly, the nonparties assert that at least part of their business involves medical factoring requiring the use of trade-secret information, which is not particularly relevant

13

to the claims or defenses in this case. Therefore, to the extent that any of the documents contain trade secret information, that information may be redacted. Specifically, information regarding the amount paid by the nonparties for an existing account receivable is not relevant, is entitled to confidentiality, and may be redacted. In addition, the amounts received by the nonparties for the subsequent resale or collection of any account receivable is not relevant, is entitled to confidentiality, and may be redacted. Finally, any formula used by the nonparties for the purchase of an existing account receivable or for the resale and collection of an account receivable is entitled to confidentiality and shall be redacted.

Wherefore, the court **GRANTS**, **in part**, and **DENIES**, **in part**, the nonparties' Motion to Modify Non-Party Subpoena, or in the Alternative, Motion for Protective Order. (ECF No. 2259). The court **GRANTS** a modification of the subpoena and **GRANTS** a protective order as set forth herein. Because the time initially scheduled for the nonparties' depositions have passed, the court **ORDERS** the parties and the nonparties to meet and confer on the issue of rescheduling the date and time of the nonparties' depositions, as well as the production of any call center recordings described above, **within seven (7) days of the entry of this Memorandum Opinion and Order**.

The court **DIRECTS** the Clerk to file a copy of this order in 2:12-md-2325 and it shall apply to each member related case previously transferred to, removed to, or filed in this district, which includes counsel in all member cases up to and including civil action number 2:16-cv-4838. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court,

a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through the CM/ECF system or the court's website at <http://www.wvsd.uscourts.gov>.

**ENTERED**: May 31, 2016

_____
Cheryl A. Eifert
United States Magistrate Judge