**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

IN RE:  AMERICAN MEDICAL SYSTEMS, INC.
         PELVIC REPAIR SYSTEMS
         PRODUCT LIABILITY LITIGATION        MDL No. 2325

----------------------------------------------------------------

THIS DOCUMENT RELATES TO ALL CASES

**PRETRIAL ORDER # 225**
(Defendant's Motion for a Preservation Order and to Conduct Forensic
Examination of Electronic Devices Belonging to Non-parties
Surgical Assistance and Wesley Blake Barber)

Pending before the court is the motion of American Medical Systems, Inc. ("AMS") requesting a preservation order and an order allowing forensic examination of electronic devices belonging to non-parties, Surgical Assistance ("SA") and Wesley Blake Barber ("Barber") (collectively "the non-parties"). (ECF No. 2696). The non-parties filed a response in opposition to the motion, (ECF No. 2878), and AMS filed a reply. (ECF No. 2936). The court held a telephonic hearing on October 3, 2016, and the parties supplemented their arguments with additional information provided to the court via written correspondence. After reviewing the memoranda and submissions of the parties, and hearing the arguments of counsel, the court **DENIES** AMS's motion.

## I.    Relevant Background

This multidistrict litigation ("MDL") involves pelvic mesh products manufactured, marketed, and distributed by AMS. The products include surgical mesh intended to be permanently implanted during operative procedures for the treatment of pelvic organ prolapse and stress urinary incontinence. The plaintiffs claim, in relevant part, that the

1

mesh is defective, causing harm to the body and leading to complications, such as chronic pain and scarring. Consequently, some of the plaintiffs have undergone surgical procedures to revise the implanted mesh, or to remove it altogether ("corrective surgeries").

In the course of discovery, AMS learned that a portion of the plaintiffs had their corrective surgeries arranged and funded through third-party funding companies. According to AMS, these arrangements were frequently complex, often expensive, and occasionally unnecessary, as some of the plaintiffs receiving the funding had health insurance to cover similar procedures. AMS was stymied in its efforts to discover the details of the funding arrangements from the plaintiffs, who seemed to know little more about them than AMS. Confronted with a lack of transparency regarding a key element of damages, AMS began seeking information from non-parties, including Surgical Assistance and Barber, about the third-party funding of corrective surgeries. At issue were both the cost and the medical necessity of the procedures.

On March 11, 2016, AMS served subpoenas for testimony and records on the Records Custodian of Surgical Assistance and W. Blake Barber. (ECF No. 2259-1 at 1; ECF No. 2259-2 at 1). The subpoenas attached a list of nineteen categories of documents to be produced by the non-parties. The categories included documents memorializing or describing communications between the non-parties and any transvaginal mesh patients; documents identifying the telephone numbers and locations of any call centers, working with or on behalf of the non-parties, that received or made calls to transvaginal mesh patients; advertising and marketing materials created or used to discuss transvaginal mesh litigation with patients; documents related to the generation of leads for mesh lawsuits; documents related to the financing or funding of corrective surgeries;

documents pertaining to ownership or financial interest in any of the aforementioned funding companies, call centers, or medical centers performing corrective surgeries; documents memorializing communications between the non-parties and financers or funders of corrective surgeries, persons arranging corrective surgeries, and various doctors, some who performed corrective surgeries; documents describing any ownership or financial interest in the proceeds from any mesh litigation; documents identifying any companies or entities in which the non-parties held an ownership interest; documents related to the referral, transfer, or sale of mesh litigation claims to law firms; and any medical and billing records received for any mesh patient who used an AMS mesh product. (ECF No. 2259-1 at 7-9; ECF No. 2259-2 at 5-7). The Records Custodian of Surgical Assistance was instructed to appear on April 21, 2016 at 10:00 a.m. at a location in Orlando, Florida and to bring the requested documents with him or her. (ECF No. 2259-1 at 1). Barber was instructed to do the same on April 22, 2016 at 10:00 a.m. (ECF No. 2259-2 at 1). The subpoenas included the standard information about the deponent's duties in responding, the protections afforded to the deponent, and steps to take in order to request quashal or modification of the subpoena.

On April 4, 2016, the non-parties filed a motion to modify subpoenas, or in the alternative, for protective order in the United States District Court for the Middle District of Florida. On April 28, 2016, the motion was transferred to this District. (ECF No. 2259-3 at 1-3). In the motion, the non-parties asserted that Barber owns Surgical Assistance, which "primarily factors (or acts in the capacity of a broker for factoring companies) receivables from medical providers who are seeking to increase or regulate their cash flow and reduce the risks of nonpayment from treating injured patients who have third party claims or lawsuits." (ECF No. 2259 at 1-2). The non-parties insisted that they were not

3

medical providers nor did they possess information regarding the medical necessity of any corrective surgeries undergone by the plaintiffs. (*Id.* at 2). They argued that the subpoenas sought irrelevant information or protected trade-secret information. (*Id.* at 1). In addition, the non-parties asserted that the production of the requested documents would reveal their "pricing, marketing, business strategy, organizational structure, and transaction structure," all of which constituted protected commercial information. (*Id.* at 6).

In response, AMS argued that the non-parties understated their role in the corrective surgery process. AMS insisted that the non-parties "obtained personal medical information about women throughout the country who received mesh implants, compiled a database from that information, and sold 'leads' from that database to litigation funding companies, to doctors who perform[ed] potentially medically unnecessary explant surgeries at a significant markup, and to 'facilitators' who [were] paid to make travel, pre-op[eration], and billing arrangements for the explant surgeries—all in exchange for thousands of dollars in kickbacks (which are tacked on to claimed damages) whenever a woman undergoes mesh explant surgery paid for by a litigation funding company." (ECF No. 2262 at 1-2). AMS contended that it was entitled to discover information related to the plaintiffs' decisions to undergo corrective surgeries and the costs of such surgeries, because that information was relevant to the reasonableness and medical necessity of the surgeries. (*Id.* at 15). With respect to the non-parties' trade-secret argument, AMS asserted that the non-parties had failed to offer any concrete examples as to the harm that would befall them if they were required to produce the requested documents. (*Id.* at 18).

On May 31, 2016, the court granted, in part, and denied, in part, the non-parties' motion to modify subpoenas, or in the alternative, for a protective order. (ECF No. 2355).

Recognizing that AMS was entitled to discover information about the sources that gave the plaintiffs advice regarding whether to undergo corrective surgeries, as well as information related to the funding of the corrective surgeries, the court found that much of the information sought by AMS's subpoenas was relevant to the MDL. Nonetheless, the court agreed with the non-parties that the subpoenas issued by AMS requesting the production of documents were overly broad in some respects. Accordingly, limitations were placed on the scope of the document requests.

On June 24, 2016, Barber appeared for deposition pursuant to a revised subpoena issued by AMS. (ECF No. 2697). Barber produced a small set of materials in response to AMS's document request and testified that all remaining documents responsive to the subpoenas had been purged prior to service of the subpoenas. Barber explained that SA acted as a middleman, bringing together plaintiffs that required medical treatment related to pelvic mesh, medical care providers, and third-party funders. (ECF No. 2911-2). To facilitate arrangements among these parties, SA set up a call center where it would conduct telephonic screenings of plaintiffs interested in corrective surgeries using a questionnaire developed by SA. If a plaintiff passed the screening, SA would obtain the plaintiff's medical records and recommend a health care provider to the plaintiff. SA would then assist in arranging the medical appointment/surgery and in acquiring funding for plaintiff to obtain the care. Barber testified that SA participated in two types of financial arrangements related to corrective surgeries—(1) factoring of accounts receivable for health care already provided and (2) loan transactions between third-party funders and plaintiffs for corrective surgeries to be performed. According to Barber, once the corrective surgeries were scheduled and financing was arranged, SA had no further involvement in the matter except to collect its commissions, which apparently came from

5

both health care providers and third-party funders.[1] Barber testified that as soon as SA's work was done on a particular case, SA deleted the electronic documentation related to that case. Thus, SA's document purging was done on a regular and ongoing basis. Barber indicated that he created the company's document destruction procedure, because the company had no obligation to hold on to the records and had no long-term use for them. Barber added that most of the records could be obtained from another source. In addition, he testified that SA stopped working on pelvic mesh cases altogether in January 2016. Barber decided at that time to wind down SA's operations in favor of a new corporation he created, Hifu USA, which provided Sonablate machines to health care providers for the treatment of prostate cancer. Barber testified that in January or February 2016, he had all of the hard drives in SA's electronic devices wiped clean, so that they could be used by Hifu USA. Barber maintains that since February 2016, Hifu USA has used the devices in its business, and no new information relating to pelvic mesh has been entered into the hard drives.

## II.   Motion for Preservation Order and Forensic Examination

AMS first seeks a preservation order from the court, arguing that Barber and SA engaged in the "wholesale destruction of materials relevant to cases still in litigation"; consequently, only an order from the court [would] ensure that all hard copy, tangible or electronically stored information" in their possession will be preserved. (ECF No. 2697). AMS states that it provided counsel for SA and Barber with a detailed preservation letter on July 18, 2016, but never received a response. AMS speculates that Barber intentionally

---

[1] The undersigned notes that Barber's attorney instructed him to assert the Fifth Amendment privilege against self-incrimination in response to every question related to loan transactions. However, Barber answered inquiries related to factoring relationships.

ordered the destruction of relevant documents from SA's computers shortly after learning that AMS had subpoenaed other individuals who worked closely with SA and Barber to capitalize on the pelvic mesh litigation. AMS asserts that a preservation order is appropriate when there is a real danger that a third party's relevant evidence will be destroyed in accordance with a retention policy. Pointing to Barber's testimony, AMS contends that "not only has there been admitted destruction of evidence, there is a 'real danger' of further destruction." (*Id.* at 5).

With respect to its second request, seeking forensic examination of deleted data, AMS claims that notwithstanding the cleaning of SA's hard drives, a significant amount of data can still be retrieved by a forensic computer expert. AMS expresses concern that SA's electronic devices continue to be used by Barber and his new company, indicating that every day the devices are used, the recovery rate of relevant documents decreases. AMS asks the court to order the non-parties to make their computers and other electronic devices available for mirror imaging by a forensic computer expert, so that any relevant information can be recovered. AMS argues that the deleted information is critical to its defense, and the burden on the non-parties to obtain mirror images will be minimal. AMS agrees to pay for all of the expense associated with the forensic computer expert and to work with SA and Barber to create search terms that will prevent disclosure of confidential or unrelated materials found on the mirror-imaged hard drives.

In response to the motion, the non-parties emphasize that they are "non-interested third parties" in the mesh MDL. (ECF No. 2878). The non-parties indicate that they produced all of the available information responsive to the subpoenas and should not be forced to participate in the recovery of deleted data based upon AMS's unfounded speculation of wrongdoing. In regard to a preservation order, the non-parties argue that

such an order is inappropriate and would be unduly burdensome. The non-parties claim that they have already produced all of the materials in their possession that were readily accessible and responsive to the subpoena and have taken no affirmative steps to delete any remaining evidence that may exist. The non-parties acknowledge their responsibility to preserve evidence; accordingly, they contend that a preservation order is unnecessary. The non-parties argue that the consequence of a preservation order would be an interruption in Barber's current business, as the only information not produced is that which may exist on the electronic equipment being used by Barber and Hifu USA. Barber and Hifu USA would be prevented from using the relevant electronic devices until mirror imaging could occur, and in the meantime, they would incur expense in monitoring their computer systems. The non-parties stress that AMS has not shown irreparable harm, necessity, or even good cause for a preservation order.

With respect to AMS's motion to compel forensic computer examination, the non-parties represent that much of the data sought by AMS was deleted "months and years" before service of the subpoenas as part of SA's document destruction policy. Moreover, SA ceased operations in January 2016, and its computers were cleaned in January or February in preparation for a new business—"again, long before ever being served" with the subpoenas. (*Id.* at 3). The non-parties object to the mirror imaging of their electronic devices, complaining that a mirror image would disclose confidential commercial information, as well as personal information, including medical records, of individuals with no connection to the pelvic mesh MDL.

**III.**     <u>**Relevant Legal Standards**</u>

"Federal courts have the implied or inherent power to issue preservation orders as part of their general authority 'to manage their own affairs so as to achieve the orderly

and expeditious disposition of cases.'" *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1071 (C.D. Cal. 2009) (quoting *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135 (2004)). However, this power "must be exercised with restraint and discretion." *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)); *see also* Fed. R. Civ. P. 26(f) advisory committee's note (2006) ("The requirement that the parties discuss preservation does not imply that courts should routinely enter preservation orders."). When considering a motion seeking entry of a preservation order, courts generally consider the following three factors:

> (1) the level of concern the court has for the continuing existence and maintenance of the integrity of the evidence in question in the absence of an order directing preservation of the evidence; (2) any irreparable harm likely to result to the party seeking the preservation of evidence absent an order directing preservation; and (3) the capability of an individual, entity, or party to maintain the evidence sought to be preserved, not only as to the evidence's original form, condition or contents, but also the physical, spatial and financial burdens created by ordering evidence preservation.

*Cognate BioServices, Inc. v. Smith*, No. CIV. WDQ-13-1797, 2014 WL 988857, at *6–7 (D. Md. Mar. 12, 2014) (citing *Capricorn Power Co. v. Siemens Westinghouse Power Corp.,* 220 F.R.D. 429 (W.D.Pa.2004); *Riego v. Carroll,* No. 08–433–SLR, 2009 WL 3448850, at *2 (D.Del. Oct. 23, 2009). While the uniqueness or importance of the evidence sought to be preserved may buttress the request for a preservation order, the nature of the evidence is not, alone, determinative of the issue. *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y. 2006). Instead, the court must balance the factors in reaching its decision.

Mirror imaging of a computer's hard drive is one method of preserving electronic evidence for later forensic examination. "A 'mirror image' is generally described as 'a forensic duplicate, which replicates bit for bit, sector for sector, all allocated and

unallocated space, including slack space, on a computer hard drive.'" *Balboa Threadworks, Inc. v. Stucky*, No. 05-1157-JTM-DWB, 2006 WL 763668, at *2–3 (D. Kan. Mar. 24, 2006) (quoting *Communications Center, Inc. v. Hewitt,* 2005 WL 3277983 at *1 (E.D. Cal. Apr.5, 2005). Although orders allowing mirror imaging have become more common in recent years, courts should exercise "caution with respect to forensic imaging in civil discovery." *John B. v. Goetz,* 531 F.3d 448, 460 (6th Cir. 2008). As the appellate court explained in *John B.*:

> Civil litigation should not be approached as if information systems were crime scenes that justify forensic investigation at every opportunity to identify and preserve every detail.... [M]aking forensic image backups of computers is only the first step of an expensive, complex, and difficult process of data analysis that can divert litigation into side issues and satellite disputes involving the interpretation of potentially ambiguous forensic evidence.

*Id.* (quoting The Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, Second Edition 11, 28 (The Sedona Conference Working Group Series, 2007)). Accordingly, "even if acceptable as a means to preserve electronic evidence, compelled forensic imaging is not appropriate in all cases, and courts must consider the significant issues implicated by forensic imaging before ordering such procedures." *Id.* (citing Fed.R. Civ.P. 34(a) Advisory Committee Note (2006) ("Courts should guard against undue intrusiveness resulting from inspecting or testing [electronic information] systems.")). For instance, when weighing the propriety of mirror imaging, a court should consider such factors as:

> (1) the needs of the case, (2) the amount in controversy, (3) the importance of the issues at stake, (4) the potential for finding relevant material, and (5) the importance of the proposed discovery in resolving the issues.

*United Factory Furniture Corp. v. Alterwitz*, No. 2:12-CV-00059-KJD-VC, 2012 WL 1155741, at *3–5 (D. Nev. Apr. 6, 2012) (citing *Playboy Enterprises, Inc. v. Welles, et. al.,*

60 F.Supp.2d 1050, 1053-54 (S.D.Cal. 1999)). Whether the information sought is cumulative, duplicative, or can be obtained from another, more convenient source is an additional consideration. *See, e.g., NOLA Spice Designs, LLC v. Haydel Enterprises, Inc.*, No. CIV.A. 12-2515, 2013 WL 3974535, at *2 (E.D. La. Aug. 2, 2013). Furthermore, mirror imaging raises concerns related to privacy and confidentiality, as "duplication [of a computer hard drive], by its very nature, increases the risk of improper exposure, whether purposeful or inadvertent" of confidential or unrelated personal information. *John B.,* 531 F.3d at 457. Consequently, the federal discovery rules are "not meant to create a routine right of direct access to a party's electronic information system, although such access might be justified in some circumstances. Courts should guard against undue intrusiveness resulting from inspecting to testing of such systems." *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, No. CIV.A. 07-2319-CM, 2009 WL 722056, at *6–8 (D. Kan. Mar. 18, 2009)

In the context of a non-party, particular consideration should be given to the intrusiveness, undue burden, and costs associated with mirror imaging. *See, e.g., Medical Components, Inc. v. Classic Medical, Inc.,* 210 F.R.D. 175, 180 n. 9 (M.D.N.C.2002) ("The current generally prevailing view is that the Court may first consider whether information should be obtained by direct discovery from a party, as opposed to from a non-party, and that the court should give special weight to the unwanted burden thrust upon non-parties when evaluating the balance of competing needs."). Indeed, Fed. R. Civ. P. 45(d) places an affirmative duty on a party seeking information from a non-party to take reasonable steps to avoid subjecting the non-party to undue burden and expense, and the failure to do so may justify an award of sanctions against the party. Moreover, Rule 45(e) explicitly excuses a non-party in the first instance from producing electronically stored information

11

("ESI") that is not reasonably accessible because of undue burden or expense. Once the non-party establishes that ESI is not readily accessible, the duty to produce the information is only triggered when the requesting party has shown the court good cause, considering the limitations contained in Rule 26(b)(2)(C). *See* Fed.R.Civ.P. 45(e)(1)(D).

## IV.   <u>Analysis</u>

Applying the above-stated principles, the undersigned finds that neither entry of a preservation order, nor mirror imaging of SA's hard drives is justified in this case. Barber has testified that ESI concerning the third-party funding of corrective surgeries for MDL plaintiffs was previously stored on SA's computers. However, since the outset of SA's involvement as a middleman in arranging corrective surgeries, SA has followed a document destruction policy of purging files as they close. Consequently, any relevant ESI was deleted on an ongoing basis, and at least a portion of the ESI was purged months and even years ago. In January or February 2016, Barber ceased arranging the third-party funding of corrective surgeries and set his sights on another business venture. At that time, he ordered SA's hard drives to be "cleaned" of any remaining information pertinent to pelvic mesh litigation and began using the computer hard drives to store ESI about treatment for patients with prostate cancer. AMS did not serve Barber and SA with a subpoena seeking information regarding the third-party funding of corrective surgeries until mid-March. Although AMS accuses Barber and SA of intentionally deleting information and cleaning hard drives to avoid compliance with subpoenas, AMS has produced no proof to substantiate that claim.

As far as information remaining on SA's electronic devices, AMS provided an affidavit from a computer expert who testified that he could recover a substantial amount of the deleted data. AMS contends that the ESI to be retrieved includes a Smartsheet

database containing the names of all of the plaintiffs (including those involved in litigation outside of this MDL) who contacted SA about corrective surgeries; communications with physicians, including discussions of their fees and commissions; communications with other individuals and entities that provided "leads"; and communications with AMS patients. According to AMS, this information will help it determine the extent of the third-party funding "scheme," disclose the amount of "kickbacks" tacked on to surgical fees, and allow AMS to defend against wrongfully-inflated damages claims.

The court first considers the needs of the case, the importance of the information sought to be recovered, and the impact of the information on a resolution the issues. While information pertinent to damages is relevant and discoverable, the materials AMS expects to recover from a forensic examination of SA's hard drives is not critical to the case. AMS has already conducted significant discovery on the issue of third-party funding of corrective surgeries and, by putting together evidence obtained from various sources, has largely identified the participants and reconstructed the process. Further, much of the information allegedly created or maintained by SA included materials available from other, more convenient sources. Some examples include plaintiffs' medical records, which are required to be provided to AMS by the plaintiffs; questionnaires that may be obtained with the medical records; loan agreements and invoices that can be requested from the plaintiffs; the names of plaintiffs who accepted third-party funding and the circumstances surrounding the surgery, which can be obtained from the plaintiffs; and payments to and from the handful of physicians working with SA, which can be requested from the physicians. Remaining documentation, such as electronic mail exchanges concerning the scheduling of surgery or the drafting of loan agreements simply are not key to AMS's

defense. Before subjecting non-parties SA and Barber to the intrusion of mirror imaging and forensic data examination, the court requires a greater level of proof that the evidence to be recovered plays an important role in the issues to be resolved. *See, e.g., MPCA King of Spades v. T.E.C. 2 Broad, Inc.,* No. 1:11CV00080, 2012 WL 1203372, at *2 (W.D. Va. Apr. 10, 2012) (Allowing plaintiffs to mirror image an electronic storage medium because the information sought to be recovered went to "the heart of [the] litigation."); *and Hedenburg v. Aramark Am. Food Servs.*, No. C06-5267RBL, 2007 WL 162716, at *2 (W.D. Wash. Jan. 17, 2007) (finding that "[t]he common thread of [cases allowing mirror imaging of computers] is that a thorough search of an adversary's computer is sometimes permitted where the contents of the computer go to the heart of the case."). Clearly, AMS can defend against inflated damages claims without collecting every piece of documentation—regardless of how mundane—connected to the corrective surgeries.

The court next considers the privacy and confidentiality concerns. First, the non-parties have represented to the court that the computers at issue have been used for months in a separate and unrelated business. Contained on the computers' hard drives are the protected health information of individuals with no connection or interest in the pelvic mesh MDLs. In addition, the non-parties claim to have sensitive commercial information related to a company and a device that AMS once tried to purchase. Finally, the non-parties indicate that attorney/client communications and attorney work product are included in the ESI. Certainly, the non-parties have a substantial interest in preventing the disclosure of sensitive information contained on their electronic devices. When weighing their interests against the likelihood of AMS recovering crucial information, the undersigned concludes that the potential of unrelated, confidential information being exposed outweighs the marginal likelihood that AMS will find

information that is truly key to its defense.

AMS argues, however, that the potential for inadvertent disclosure can be greatly reduced if the non-parties and AMS work together on search terms. While that assertion may be true, the work involved in negotiating search terms raises the issue of burden and expense. Not only will the current business that is using the electronic devices be burdened by the time involved in making mirror images, but the non-parties will also have to pay an attorney to assist with search terms and review documents prior to disclosure. AMS has not supplied evidence showing that the non-parties created this situation by willfully destroying relevant evidence that the non-parties knew should be preserved. *See Playboy Enterprises, Inc.,* 60 F.Supp.2d at 1050 (ordering mirror imaging upon finding that party systemically deleted e-mails after litigation had commenced). Similarly, AMS also has not shown that the non-parties defaulted on their duty to comply with the subpoena by failing to produce all of the readily accessible relevant documents in their possession. *See, NOLA Spice Designs, LLC*, 2013 WL 3974535, at *3 ("[C]ourts have permitted restrained and orderly computer forensic examinations where the moving party has demonstrated that its opponent has defaulted in its discovery obligations by unwillingness or failure to produce relevant information by more conventional means.") Accordingly, AMS provides no compelling reason to require the non-parties to incur additional legal fees in order to provide the information sought by AMS.

Having concluded that AMS is not entitled to mirror image the non-parties' electronic devices, the court further finds that AMS is not entitled to a preservation order. The non-parties represented that they supplied all available relevant information in their possession in response to AMS's subpoena. AMS does not contest that all readily accessible documentation was provided. Therefore, the only remaining information is ESI

15

that was deleted. Because the ESI is not reasonably accessible and AMS has not provided good cause for its production, no evidence exists to preserve; thus, no order of preservation shall issue.

The court **DIRECTS** the Clerk to file a copy of this order in 2:12-md-2325 and it shall apply to each member related case previously transferred to, removed to, or filed in this district, which includes counsel in all member cases up to and including civil action number 2:16-cv-10634. In cases subsequently filed in this district, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action at the time of filing of the complaint. In cases subsequently removed or transferred to this court, a copy of the most recent pretrial order will be provided by the Clerk to counsel appearing in each new action upon removal or transfer. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through the CM/ECF system or the court's website at **http://www.wvsd.uscourts.gov**.

**ENTERED:** November 10, 2016


Cheryl A. Eifert
United States Magistrate Judge